**LOCAL 13, INTERNATIONAL LONGSHOREMEN'S & WAREHOUSEMEN'S UNION, Plaintiff and Counter-Defendant,**

v.

**PACIFIC MARITIME ASSOCIATION, Defendant and Cross-Claimant,**

and

**International Longshoremen's and Warehousemen's Union, Defendant and Cross-Defendant.**

**Nos. 65–1414, 65–1420.**

United States District Court
C. D. California.

Dec. 20, 1967.

---

Kenneth W. Gale, San Pedro, Cal., for plaintiff and counter-defendant, Local 13.

Richard Ernst and G. L. Munter, Jr., San Francisco, Cal., for defendant and cross-claimant Pacific Maritime Assn.

Gladstein, Anderson, Leonard & Sibbett, Norman Leonard, San Francisco, Cal., for defendant and cross-defendant, International Longshoremen's and Warehousemen's Union.

1. Opinion and Decision of Sam Kagel, Coast Arbitrator, dated June 29, 1965, Appendix I hereto attached.

2. Opinion and Decision of Germain Bulcke, Area Arbitrator, dated February 13, 1965, Appendix II hereto attached.

## DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER DISMISSING AMENDED COMPLAINT AND GRANTING SUMMARY JUDGMENT.

HAUK, District Judge.

This action was commenced in the Los Angeles Superior Court in September, 1965, by Local 13, International Longshoremen's and Warehousemen's Union, hereinafter referred to as "Local 13", against the Pacific Maritime Association, hereinafter referred to as "PMA", and the International Longshoremen's and Warehousemen's Union, hereinafter referred to as the "ILWU", seeking to set aside a final arbitration award deregistering one Pete Velasquez from the Joint Employer-Union Longshoreman List because of deliberate, repeated and illegal work stoppages prohibited by the ILWU-PMA Pacific Coast Longshore Agreement, which award was rendered by the Coast Arbitrator in the fifth and final stage of the collective bargaining agreement's grievance procedure.[1] Local 13 also attacks the preliminary decision handed down by the Area Arbitrator.[2]

Upon petition by the ILWU the matter was removed to this Court on the ground that we have jurisdiction under Title 28 United States Code, Section 1337, providing that the District Court shall have original jurisdiction of any civil action arising under any Act of Congress regulating commerce.[3]

An amended complaint was filed requesting the same relief that had been sought in the state court, and a cross-claim and counter-claim to enforce the final arbitration award has been filed by PMA.

Original jurisdiction of this Court has now been invoked pursuant to Section 301(a) of the Labor-Management

3. 28 U.S.C. 1337
 "§ 1337. *Commerce and anti-trust regulations*

 "The district courts shall have original jurisdiction of any civil action or proceedings arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

Relations Act of 1947, as amended, 29 United States Code, Section 185(a),[4] which provides that suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce may be brought in any District Court of the United States having jurisdiction over the parties without regard to the amount in controversy or the citizenship of the parties. In view of the fact that Local 13 is claiming a violation of an agreement between PMA, an employer, and ILWU, a labor organization, in the maritime industry which obviously affects commerce, this action is clearly within the original jurisdiction of this Court pursuant to the provisions of 29 United States Code Section 185(a). Moreover, the Supreme Court has stated on several occasions that under this Section the District Court has jurisdiction to enforce an arbitrator's final award entered under a collective bargaining contract. See United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 595–596, 80 S.Ct. 1358, 1360, 4 L.Ed. 2d 1424, 1427 (1960), United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 567, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403, 1406–1407 (1960), and General Drivers, Warehousemen and Helpers, Local Union No. 89 v. Riss & Co., 372 U.S. 517, 519, 83 S.Ct. 789, 791, 9 L.Ed.2d 918, 920 (1963).

Defendants PMA and ILWU are parties to the "Pacific Coast Longshore Agreement, 1961–1966", the collective bargaining agreement covering a substantial portion of the longshore work on the Pacific Coast. The contract, in its grievance procedure, sets forth the following formal steps: (1) a Joint Port Labor Relations Committee having jurisdiction over grievances and disputes that arise in a single port; (2) a Joint Area Labor Relations Committee having jurisdiction over a wider geographical area; (3) arbitration before an Area Arbitrator who has jurisdiction over the same area as the Joint Area Committee; (4) a Joint Coast Labor Relations Committee having jurisdiction over the entire geographical area covered by the collective bargaining agreement; and finally, (5) arbitration before the Coast Arbitrator. In the first three steps, the interests of the employees are represented by officials of the local union or unions functioning in the port or area involved. The final two steps of the formal grievance procedure are conducted by officials of the international union. In this case, Local 13 was involved in the three lower steps of the grievance machinery and officials of the ILWU appeared on behalf of the employee in the fourth Joint Coast Committee step and in the final step of arbitration before the Coast Arbitrator.

The Agreement also sets out the procedure for instituting grievances and carrying them forward. If a matter fails to be resolved at a particular stage, the contract provides that it may be referred to the next step in the formal grievance procedure. However, Section 17.15 of the Agreement clearly provides that awards of the Coast Arbitrator are final and binding without qualification.[5]

The amended complaint asks this Court to vacate and set aside the final Coast

4. 29 U.S.C. 185
 "§ 185. *Suits by and against labor organizations—Venue, amount, and citizenship*
 "(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

5. *Pacific Coast Longshore Agreement 1961–1966:*
 "17.15. The grievance procedure of this Agreement shall be the exclusive remedy with respect to any disputes between the Union or any person working under this Agreement or both, on the one hand, and the Association or any employer acting under this Agreement or both, on the other hand, and no other remedies shall be utilized by any person with respect to any dispute involving this Agreement until the grievance procedure has been exhausted."

arbitration award and a preliminary area arbitration award which have the combined effect of denying further employment to Pete Velasquez, an employee of PMA and a member of Local 13 and the ILWU, by removing his name from the list of registered longshoremen. PMA had sought his deregistration through the grievance procedure on the ground that he had been guilty of deliberate, repeated and illegal work stoppages prohibited by the Agreement. The grievance had traveled through each step of the formal procedure prior to the award of the Coast Arbitrator deregistering Velasquez.

In seeking to upset and vacate the two arbitration awards and to have Velasquez reregistered, Local 13 contends, first, that the arbitration decisions were in violation of the collective bargaining agreement in that deregistration is not permitted under the circumstances of this grievance; and, second, that there were fatal defects in the actual operation of the grievance procedure with respect to Velasquez because of dishonest, hostile, arbitrary and capricious action of the ILWU in bad faith and in violation of its statutory duty of fair representation of employees.

■ Both PMA and the ILWU have moved for summary judgment after considerable pretrial discovery, a comprehensive pretrial conference order and voluminous contentions of law and fact have demonstrated that there is no genuine issue as to any material fact. The Court has reached the decision that the motion for summary judgment should be granted but it should be noted that this decision was reached only after the plaintiff exhausted numerous and extensive opportunities to show there were litigable issues of fact on this element of its claim. Among other things in the record before the Court are the pleadings and a jointly approved pretrial order, interrogatories by PMA and answers by Local 13, requests for admissions by PMA and re-

sponses by Local 13, defendants' motion and supporting memorandum and plaintiff's response and supporting exhibits including the transcripts of all the arbitration proceedings. The matter was extensively argued by counsel, in writing and orally. Plaintiff has presented the same factual claims several times in the record and in its oral argument. Detailed statement of the factual claims was required by the interrogatories filed by defendants. Additionally, plaintiff has been given repeated opportunity to state and to expand upon its factual claims both in writing and in oral presentation. The Court has reviewed all of this material and concludes that, even if every alleged fact that is favorable to plaintiff were true, such facts would not establish any litigable issue, that is, any genuine issue as to any material fact, and would not establish any cause of action for plaintiff. On the contrary, the facts, all taken in the light most favorable to plaintiff, establish that the defendants are entitled to summary judgment.

Now the Court, having heard the arguments and having examined all of the files, documents and records herein, the cause having been submitted for decision, and the Court being fully advised in the premises, makes its findings of fact as follows:

## FINDINGS OF FACT

### — 1 —

PMA is a duly organized and existing California non-profit corporation having its principal place of business in Wilmington, California. PMA represents its member steamship, stevedoring and terminal companies for the purpose of negotiating and administering the collective bargaining contracts with the unions representing the stevedoring employees of its member companies. The companies represented by PMA are engaged in commerce, as defined by the Labor-Management Relations Act of 1947, as

amended, 29 United States Code, Section 142.[6]

— 2 —

The ILWU is a duly organized and existing labor organization within the meaning of the Labor-Management Relations Act of 1947, as amended, 29 United States Code, Section 152.[7] The ILWU was certified by the National Labor Relations Board on June 21, 1938, as the exclusive bargaining representative for longshoremen on the Pacific Coast.[8] Moreover, it is the exclusive representative for collective bargaining purposes for employees performing longshore work for members of PMA along the Pacific Coast.

— 3 —

Local 13 is one of the ILWU's longshore locals. Local 13 is also located in Wilmington, California, and its members are engaged in longshoring in the Los Angeles and Long Beach harbor areas.

— 4 —

PMA and the ILWU have entered into a collective bargaining contract, entitled "Pacific Coast Longshore Agreement, 1961–1966", governing the wages, hours, working conditions and disciplining of longshoremen employed by PMA members on the Pacific Coast. This agreement also binds Local 13 and its members.

— 5 —

The contract contains a grievance procedure for the resolution of disputes. In the event that a dispute is not settled on the job or does not arise on the job, it then moves to a formal grievance procedure containing the following five steps: (1) a Joint Port Labor Relations Committee having jurisdiction over grievances and disputes arising in a single port; (2) a Joint Area Labor Relations Committee having jurisdiction over a wider geographical area; (3) arbitration before an Area Arbitrator who has jurisdiction over the same area as the Joint Area Committee and enjoys the additional power to pass upon its own jurisdiction; (4) a Joint Coast Labor Relations Committee having jurisdiction over the entire geographical area covered by the collective bargaining contract; and (5) arbitration before a Coast Arbitrator who, like the Area Arbitrator, has the power to pass upon his own jurisdiction.

— 6 —

The contract establishes a group of employees, referred to as Class A longshoremen, who have a priority over other employees in obtaining available longshore work and in securing other benefits.

— 7 —

Pete Velasquez was a Class A longshoreman from July, 1953 until July 29, 1965 in the Los Angeles–Long Beach Harbor. However, from October 1, 1962 until October 1, 1964, Velasquez served most of his time as a night business agent for Local 13. Velasquez worked primarily as a longshoreman again from October, 1964 until July, 1965.

— 8 —

During the time Velasquez was a night business agent as well as during the latter part of 1964, various member companies of PMA had filed a dozen charges against

6. 29 U.S.C. § 142.
 "§ 142. *Definitions*
 "When used in this chapter—
 "(1) The term 'industry affecting commerce' means any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce or tend to burden or obstruct commerce or the free flow of commerce."

7. 29 U.S.C. § 152.
 "§ 152. *Definitions*
 "When used in this subchapter—

* * * * *

"(5) The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

8. See 7 N.L.R.B. 1002 (June 21, 1938).

Velasquez. On the basis of these twelve complaints, PMA moved to deregister Velasquez by taking the first step in the grievance procedure before the Joint Port Labor Relations Committee (Los Angeles–Long Beach) meeting in December, 1964 after Velasquez had been involved in a dispute on board the S.S. President Quezon.

— 9 —

At the Joint Port Labor Relations Committee meeting, the parties were unable to resolve the issues involving Velasquez, and PMA accordingly referred the matter to the Joint Area Labor Relations Committee.

— 10 —

The Velasquez grievances were considered but not resolved in the December 14, 1964 meeting of the Joint Area Labor Relations Committee, and the matter was referred to the Area Arbitrator by PMA.

— 11 —

In accordance with the custom in the Los Angeles and Long Beach harbor areas, the employee and the local union were represented in the committee meetings and in the area arbitration by officials of Local 13.

— 12 —

On January 4, 5, and 6, 1965, an arbitration hearing was held before Germain Bulcke, the Area Arbitrator for the Southern California area. Officials of Local 13 participated in that portion of the hearing during which evidence was presented relating to the alleged contract violations committed by Velasquez while he was working as a longshoreman after he had completed his term as night business agent. This portion of the hearing, involving the S.S. President Quezon and the S.S. Michigan, was concluded on January 5, 1965. The balance of the hearing, concerning the complaints against Velasquez for contract violations while he was a night business agent, was conducted and completed on January 6, 1965, but officials of Local 13 refused to participate in it.

— 13 —

The Area Arbitrator ruled that the proceeding could continue ex parte under the terms of the contract, and this ruling was not challenged anywhere in the subsequent two formal steps of the grievance procedure.

— 14 —

On February 13, 1965, Area Arbitrator Bulcke rendered a decision finding Velasquez guilty of ten of the twelve complaints filed against him, including the complaints concerning the S.S. President Quezon and the S.S. Michigan.

— 15 —

Officials of Local 13 then referred the Velasquez grievance to the Joint Coast Labor Relations Committee, where the employee and union were represented by officials of the ILWU which is customary at this level of the grievance procedure. When the Committee considered the grievance on March 23, 1965, PMA and the ILWU were unable to agree on a resolution of the matter, and it was referred to the final step in the arbitration process, a hearing before Sam Kagel, the Coast Arbitrator.

— 16 —

On April 28, 1965, a hearing was held before the Coast Arbitrator at which the employee and union were represented by officials of the ILWU. The ILWU spokesman took the position that, while a union official could be deregistered for repeated contract violations, deregistration was not warranted under the circumstances of this case. The Arbitrator rendered an award deregistering Velasquez on June 29, 1965 and ordered his name removed from the list of Class A longshoremen.

— 17 —

For several years prior to the Velasquez matter, Germain Bulcke, as Area Arbitrator for the Southern California area, and Sam Kagel, as Coast Arbitrator, were the designated arbitrators who regularly heard grievances arising under this contract.

— 18 —

Local 13 has asserted that the ILWU acted arbitrarily, discriminatorily and in bad faith in processing the Velasquez grievance. More specifically, it contends that this conclusion is warranted on the basis of the following factual claims which the Court, taking all facts in the light most favorable to plaintiff and for the purpose of ruling upon the motion for summary judgment, assumes and finds to be true:

A. That the ILWU and the PMA jointly selected the arbitrators and that these individuals were personally well-known to the presidents of the ILWU and PMA.

B. That Mr. Bill Ward, an officer of the ILWU, had a telephone conversation with Mr. Curt Johnston, then the president of Local 13, in November, 1964, in which Ward mentioned "Mickey Mouse" (a commonly used nickname of Velasquez) and the issues and problems of working extended shifts which Velasquez had been raising as a union official and as a working longshoreman. Johnston commented that the problem of working extended shifts still existed, and Ward replied that the ILWU would take care of that difficulty and "handle the mouse up here (in San Francisco)."

C. That the presidents of the ILWU and PMA, who did not ordinarily attend local labor relations committee meetings, attended the one on December 8, 1964, concerning Velasquez' involvement, as a working longshoreman, in the work stoppage on December 1, 1964, on the S.S. President Quezon.

D. That at the meeting on December 8, 1964, the president of PMA made certain proposals regarding the procedures for processing the Velasquez matter through the grievance machinery and that the president of the ILWU, in evaluating the PMA proposals, stated to representatives of Local 13 that PMA's president was a very determined man once he had taken a hard and fast position.

E. That on January 4, 1965, after the first day of the area arbitration hearing involving Velasquez' conduct while a working longshoreman, including the incident aboard the S.S. President Quezon, had been completed and after Local 13 had indicated its refusal to participate in the further phase of the hearing relating to Velasquez' conduct while acting as a union business agent, there was a telephone conversation between the president of Local 13 and Area Arbitrator Bulcke. During the conversation, Bulcke urged Local 13 to continue with the arbitration and present a case in the defense of Velasquez on the other issues, in the course of which Bulcke is reported to have stated, "We know Pete Velasquez is guilty and he is going to have to receive some kind of penalty."

F. That in the spring of 1965, after the Area Arbitrator had entered his award but before the issues had been heard by the Coast Arbitrator, there was a conversation between Velasquez and the president of the ILWU, Harry Bridges, during which Bridges emphatically criticized Velasquez' conduct, stated that the probable outcome of the coast arbitration would be his deregistration, and asserted that he (Bridges) was the only one who could then help Velasquez.

G. That the president of the ILWU made certain statements from which it could be inferred that the international union was more interested in a favorable decision on the "belly-packing" issue than on the question of subjecting a union official to deregistration for repeated contract violations, which was the issue involved in the Velasquez grievance.

H. That the PMA gave careful consideration to the decision to attempt to deregister Velasquez as a Class A longshoreman for contract violations while serving as a union business agent.

I. That the ILWU acquiesced in the Coast Arbitrator's award which

was "flagrantly against union principles".

J. That, following the Coast Arbitrator's award, the Area Arbitrator talked with the Coast Arbitrator and expressed surprise at the severity of the award and suggested the steps that might be taken to negotiate the re-registration of Velasquez.

K. That the award manifestly disregards the collective bargaining agreement and the law.

— 19 —

The allegations contained in Local 13's amended complaint, to the extent that they are inconsistent with the Findings of Fact herein, are untrue.

— 20 —

The following Conclusions of Law, insofar as they may be concluded Findings of Fact, are so found by this Court to be true in all respects. From the foregoing facts, the Court concludes that:

## CONCLUSIONS OF LAW

### I

The original jurisdiction of this Court has been properly invoked pursuant to Section 301(a) of the Labor-Management Relations Act of 1947, as amended, 29 United States Code, Section 185(a).[9]

### II

The award of the Coast Arbitrator, the award of the Area Arbitrator, as well as the decisions rendered throughout all stages of the grievance machinery were and are in complete accordance with the terms of the collective bargaining agreement between employer and union, "Pacific Coast Longshore Agreement, 1961–1966", particularly the terms governing the grievance-arbitration procedure.

■ Each award and decision, "reached after proceedings adequate under the agreement, is final and binding upon the parties, just as the contract says it is." Humphrey v. Moore, 375 U.S.

335, 351, 84 S.Ct. 363, 372, 11 L.Ed.2d 370, 382–383 (1964) relying upon General Drivers Warehousemen and Helpers, Union Local No. 89 v. Riss & Co., 372 U.S. 517, 519, 83 S.Ct. 789, 791, 9 L.Ed. 2d 918, 920 (1963).

### III

The responsibility and duty of every union which, like the ILYU in this case, is the exclusive bargaining agent in the negotiation and administration of a collective bargaining contract such as "Pacific Coast Longshore Agreement, 1961–1966" in this case, has been fully and definitively set out by the United States Supreme Court:

"The undoubted broad authority of the union as exclusive bargaining agent in the negotiation and administration of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation. Syres v. Oil Workers [Intn.] Union, 350 U.S. 892, [76 S.Ct. 152, 100 L.Ed. 785 (1955)] reversing 223 F.2d 739 [(5th Cir. 1955)]; Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, [72 S.Ct. 1022, 96 L.Ed. 1283 (1952);] Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U.S. 210, [65 S.Ct. 235, 89 L.Ed. 187 (1944);] Steele v. Louisville & N. R. Co., 323 U.S. 192, [65 S.Ct. 226, 89 L.Ed. 173 (1944).] 'By its selection as bargaining representative, it has become the agent of all the employees, charged with the responsibility of representing their interests fairly and impartially.' Wallace Corp. v. [National] Labor [Relations] Board, 323 U.S. 248, 255. [65 S.Ct. 238, 242, 89 L.Ed. 216, 227 (1944).] The exclusive agent's obligation 'to represent all members of an appropriate unit requires [it] to make an honest effort to serve the interests of all those members, without hostility to any. * * *' and its powers are 'subject always to complete good faith and honesty of purpose in the exer-

9. Note 4, supra. See also Humphrey v. Moore, 375 U.S. 335, 343–344, 84 S.Ct.

363, 368–369, 11 L.Ed.2d 370, 378–379 (1963).

cise of its discretion.' Ford Motor Co. v. Huffman, 345 U.S. 330, 337–338, [73 S.Ct. 681, 686, 97 L.Ed. 1048, 1057–1058 (1953).]"

In this connection "a wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." Humphrey v. Moore, supra, 375 U.S. at 349, 84 S.Ct. at 372, 11 L.Ed.2d at 382, quoting Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048, 1058 (1953).

Putting it another way, as the Supreme Court has done even more recently, in enlarging upon the teaching of Humphrey:

"It is now well established that, as the exclusive bargaining representative of the employees in Owens' bargaining unit, the Union had a statutory duty fairly to represent all of those employees, both in its collective bargaining with Swift, see Ford Motor Co. v. Huffman, 345 U.S. 330, [73 S.Ct. 681, 97 L.Ed. 1048 (1953)]; Syres v. Oil Workers International Union, 350 U.S. 892, [76 S.Ct. 152, 100 L.Ed. 785 (1955)], and in its enforcement of the resulting collective bargaining agreement, see Humphrey v. Moore, 375 U.S. 335, [84 S.Ct. 363, 11 L.Ed. 370 (1964)]. The statutory duty of fair representation was developed over 20 years ago in a series of cases involving alleged racial discrimination by unions certified as exclusive bargaining representatives under the Railway Labor Act, see Steele v. Louisville & N. R. Co., 323 U.S. 192, [65 S.Ct. 226, 89 L.Ed. 173 (1944)]; Tunstall v. Brotherhood of Locomotive Firemen, 323 U.S. 210, [65 S.Ct. 235, 89 L.Ed. 187 (1944)], and was soon extended to unions certified under the N.L.R.A.,

see Ford Motor Co. v. Huffman, supra. Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. Humphrey v. Moore, 375 U.S., at 342 [84 S.Ct. at 367, 11 L.Ed.2d at 378]. It is obvious that Owens' complaint alleged a breach by the Union of a duty grounded in federal statutes, and that federal law therefore governs his cause of action. E. g., Ford Motor Co. v. Huffman, supra." Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842, 850 (1967).

The principal issue, then, before this Court is the same as the Supreme Court confronted in *Humphrey*. There, a decision rendered in the final stage of a grievance procedure, which had the effect of denying further employment to certain workers through a dovetailing of seniority lists, was charged to be arbitrary and capricious, contrary to the existing practice in the industry and violative of the collective bargaining agreement.[10] The Supreme Court held that a final arbitration award precludes judicial interference in the absence of a showing that the award has been obtained by improper union conduct in disregard of its duty of fair representation.[11]

The undoubted broad authority of a union as the exclusive bargaining agent in the negotiation and administration of a collective bargaining contract is accompanied by a responsibility of equal scope, the duty of fair representation, a duty derived not from the collective bargaining contract but implied from the union's rights and obligations conferred by federal labor statutes.[12] By its selection as the bargaining representative, the

10. Humphrey v. Moore, 375 U.S. 335, 340, 84 S.Ct. 363, 367, 11 L.Ed.2d 370, 376 (1964).

11. Id., at 351, 84 S.Ct. at 372, 11 L.Ed.2d at 382.

12. Humphrey v. Moore, supra, 375 U.S. at 342, 84 S.Ct. at 368, 11 L.Ed.2d at 377, and Justice Goldberg's concurring opinion, 375 U.S. at 356, 84 S.Ct. at 375, 11 L.Ed.2d at 385.

union becomes the agent of all the employees and is charged with the responsibility of representing their interests fairly and impartially.[13] The agent's obligation to represent all members of a bargaining unit requires it to make an honest effort to serve the interests of all members without hostility to any and its powers are subject to complete good faith and honesty in the exercise of its discretion.[14]

Having in mind then that a breach of the statutory duty of fair representation occurs *only* "when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith", Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed. 2d 842, 857 (1967), we search throughout the record in the case before us in vain for a factual basis to support any breach of the statutory duty of fair representation by ILWU.

Strictly conclusionary words and phrases abound—fraud, deceitful action, dishonest activity, invidious and irrelevant considerations, corruption, undue means, conspiracy, connivance, hostile discrimination, arbitrary and discriminatory conduct in bad faith. But these are only words and phrases, fright-words, and emotion-packed symbols. They are not facts. Nowhere in the record can we find facts, allegations of facts, or factual claims to support conduct of the ILWU that is arbitrary, discriminatory or in bad faith, and the mere conclusions are not enough and do not raise a genuine issue as to any material fact. Hardcastle v. Western Greyhound Lines, 303 F.2d 182, 186 (9th Cir. 1962).

Nowhere in the record can we find any support for plaintiff's attack upon the integrity of the ILWU and of the procedures which led to the Coast Arbitrator's award, the Area Arbitrator's award, and the other three preliminary decisions in the five-step grievance procedure provided by the collective bargaining agreement. Nowhere is there a factual statement, claim or allegation of fraud, deceitful action or dishonest conduct.

As far as this record shows, the factual statements, allegations and claims, taken in the light most favorable to plaintiff, demonstrate that the ILWU "took its position honestly, in good faith, and without hostility or arbitrary discrimination"; that it acted "upon wholly relevant considerations, not upon capricious or arbitrary factors"; and that there was "no breach by the union of its duty of fair representation". Humphrey v. Moore, supra, 375 U.S. at 350, 84 S.Ct. at 372, 11 L.Ed.2d at 382.

The record does show that the ILWU fought on behalf of Velasquez and Local 13 against PMA in the five steps of the grievance procedure vigorously and at times even vituperatively, but always valorously and and valiantly.

The fact that the fight was ultimately in vain does not make it procedurally invalid. Local 13 and Velasquez through their agent ILWU have both had their "day in court"—fully, fairly, and finally, with their rights meticulously protected and honored. They lost, but only after a bitter battle in an open arena before two honest Arbitrators—Area and Coast —under fair rules.

Our "instant replay" of the battle confirms the decisions and awards in the five-step grievance procedure. The Losers, Local 13 and Velasquez, are not entitled to a new and different fight in a new and different arena under new and different judges—the courts—just because they lost in the battle and in the arena and before the judges specifically provided by the collective bargaining agreement. The decisions and awards already reached "after proceedings adequate under the agreement" are final and binding upon the parties. Humphrey v. Moore, supra, at 351, 84 S.Ct. at 372, 11 L.Ed.2d at 382–383.

### IV

In taking up each of the factual claims which the Court has assumed and found

13. Wallace Corp. v. National Labor Relations Board, 323 U.S. 248, 255, 65 S.Ct. 238, 242, 89 L.Ed. 216, 227 (1944).

14. Ford Motor Co. v. Huffman, 345 U.S. 330, 337–338, 73 S.Ct. 681, 686, 97 L.Ed. 1048, 1057–1058 (1953).

to be true in Finding of Fact 18 above, the Court concludes as follows:

### A. *The ILWU did not breach its duty of fair representation by its acts in selecting the arbitrators.*

Plaintiff asserts a *Humphrey* discrimination on the ground that Germain Bulcke, the Area Arbitrator, and Sam Kagel, the Coast Arbitrator, were selected as arbitrators by the presidents of PMA and the ILWU, J. Paul St. Sure and Harry Bridges, respectively. While Local 13 did participate in selecting the area arbitrator prior to 1960, this authority was withdrawn by Section 17.51 of the contract which provides that the designation of arbitrators thereafter is to be made by the parties to the agreement, PMA and the ILWU.[15]

█ This method of selecting the arbitrators is not attacked. Instead, plaintiff asks this Court to substitute its judgment regarding the qualifications of the arbitrators for the judgment of the parties who have agreed to submit their disputes to those particular arbitrators. Clearly the Court should not do this. See United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

In any event the record demonstrates that the arbitrators are eminently well qualified. The admissions in the pretrial conference order show that Germain Bulcke became the Area Arbitrator for Southern California in 1960 (Admitted fact No. 26) and that during the period Germain Bulcke has served as Area Arbitrator he rendered awards in a substantial number of controversies. (Admitted fact No. 29.) They further show that, during and after the Velasquez controversy, Local 13 has not sought to disqualify Bulcke from further service as Area Arbitrator. Admitted facts Nos. 26, 27 and 28 in the pretrial conference order indicate that Germain

Bulcke had a long history of contact with the stevedoring industry on the Pacific Coast, including working as a longshoreman and administering the collective bargaining contracts as an officer of Local 10 and as vice president of the ILWU. The fact that Germain Bulcke was eminently well qualified to consider and resolve disputes arising out of the Pacific Coast Longshore Agreement in no fashion shows a lack of fair representation of Pete Velasquez or Local 13 by the ILWU.

█ Similarly, Local 13 is attacking the appointment of Sam Kagel as Coast Arbitrator. The Court may take judicial notice of the significant facts. He is a full professor at the School of Law at the University of California at Berkeley (Boalt Hall) and a noted writer in the field of arbitration law. Professor Kagel served on the California Law Revision Commission that drafted the Arbitration Act that was enacted by the California State Legislature and codified in the California Code of Civil Procedure, Section 1280 et seq. Professor Kagel has served as arbitrator in numerous labor disputes arising in a wide variety of industries including the recent dispute involving the agricultural workers in the central California valleys. Admissions 31, 32 and 33 indicate that Professor Kagel has rendered a number of decisions in disputes arising under the Pacific Coast Longshore Agreement and that Local 13 has not sought to disqualify Sam Kagel from further service as Coast Arbitrator. Clearly the ILWU did not breach its duty of fair representation by participating in the selection of Professor Kagel as the final arbitrator in labor disputes arising in the stevedoring industry on the Pacific Coast of the United States.

█ It should be noted that Local 13 concedes that it failed to initiate steps to

---

15. *Pacific Coast Longshore Agreement (1961–1966)*
 "17.51. The parties have an arbitrator for each of the four said port areas and a Coast Arbitrator. If any arbitrator shall at any time be unable or re-

fuse or fail to act, the parties shall select his successor or substitute. If a vacancy occurs and the parties fail to agree on the successor or substitute, he shall be appointed at the request of either party by Mr. E. D. Conklin."

disqualify Bulcke as an arbitrator following his decision to deregister Velasquez. In view of the fact that Bulcke was appointed in 1960 pursuant to the 1960 revisions in the grievance procedure and had participated in the resolution of numerous disputes from the time of his appointment until September, 1966, Local 13's familiarity with Bulcke and the manner in which he discharged his appointed duties compel the observation and conclusion that objections to Bulcke, as well as to Kagel, if Local 13 had any, should have been made at a time earlier than in these proceedings. Under such circumstances, neither the method of appointing arbitrators nor the change in the manner of their appointment can imply a *Humphrey* discrimination in the union's representation of Velasquez' grievance.

As a further basis for suggesting that the ILWU breached its duty of fair representation, Local 13 charges that the arbitrators in this instance were personally known to the presidents of PMA and the ILWU. This Court is compelled to reject such an argument in view of the reasons set forth in United Steelworkers of America v. Warrior and Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Recognizing that a labor arbitrator's source of law includes the practices of the industry and the shop —the industrial common law—as well as the express provisions of the collective bargaining agreement, the Supreme Court observed that an arbitrator is usually chosen on the basis of the parties' confidence in his familiarity with the problems inherent in the particular industry in the process of industrial self-government, and because of their expectation that his resolution of a particular grievance will reflect factors other than those expressly set out in the contract.[16] Contrary to the allegations advanced by Local 13, *Warrior and Gulf* suggests that it is unrealistic to expect that parties to a collective bargaining contract would surrender the arbitration responsibilities to persons with whom they are not acquainted.

B. *The ILWU did not breach its duty of fair representation by referring to Velasquez as "Mickey Mouse" and by offering to handle "extended shift" problems at the Coast or San Francisco level rather than at the local level.*

Local 13 charges that Mr. Bill Ward, an officer of the ILWU, had a telephone conversation with Mr. Curt Johnston, then the president of Local 13, in November, 1964. Ward's inquiry about "Mickey Mouse", a common nickname for Velasquez, prompted a discussion of the issue of working extended shifts in view of Velasquez' association with this problem as a union officer and as a working longshoreman. Johnston commented that the problem still existed, and Ward responded that the ILWU would handle that situation as well as "the mouse" at its San Francisco office. It is difficult to conclude that anything short of a distorted interpretation of this conversation would tend to establish that the ILWU officer's comments amounted to hostility toward one of its members or other breach of the duty of fair representation.

C. *The ILWU did not breach its duty of fair representation by having its president attend or not attend local labor relations committee meetings.*

Local 13 has suggested that the ILWU breached its duty of fair representation because the president of PMA and the president of the ILWU did not customarily attend local labor relations committee meetings in Southern California but did attend the one on December 8, 1964, involving Velasquez' work stoppage on the S.S. President Quezon.

The organization and operation of the grievance procedure is set out in § 17 of the Pacific Coast Longshore Agreement. It provides for numerous first step port grievance solving com-

---

16. United Steelworkers of America v. Warrior and Gulf Navigation Co., 363 U.S. 574, 581–582, 80 S.Ct. 1347, 1352–1353, 4 L.Ed.2d 1409, 1417 (1960).

mittees and for four area grievance solving committees. It is readily apparent that the president of the ILWU and the president of PMA could not and should not participate on a routine basis in the operation of these local committees. On the other hand, at critical times when large issues are at stake, one would ordinarily expect the chief executive officers of these organizations to personally interest themselves in local issues. The fact that the ILWU used its top official to represent Local 13 or Pete Velasquez in handling a grievance in no way implies that the ILWU breached its duty of fair representation in handling that grievance.

In view of the contract's coverage of longshore work in California, Oregon and Washington, it would be unrealistic to expect these officers to participate in the meetings of local committees on a routine basis. The attendance of the chief executive officers of these organizations at the meeting which considered the charges against Velasquez, conducted after a work stoppage in which Velasquez, as a working longshoreman, refused to comply with an Area Arbitrator's on-the-job interim award, clearly indicates that they considered the grievance to be of particular importance. This Court is unable to draw any conclusion from the ILWU president's personal participation in the proceedings other than one indicating an interest in discharging his union's responsibility toward those within the bargaining unit.

D. *The ILWU did not breach its duty of fair representation in evaluating PMA's proposals regarding the procedural handling of the Velasquez complaints.*

Local 13 asserts that Paul St. Sure, president of PMA made certain proposals regarding the procedural handling of the Velasquez complaints. Local 13 further asserts that the ILWU breached its duty of fair representation because it stated to Local 13 and officers of Local 13 at that time in a private caucus that Mr. St. Sure was a determined man when he had taken a hard and fast position. Quite obviously Mr. Bridges' evaluation of Mr. St. Sure, a man with whom he had frequent dealings for over twelve years, could hardly be said to be a breach of the ILWU's duty of fair representation.

E. *The ILWU did not breach its duty of fair representation by reason of the telephone conversation between Curt Johnston and Germain Bulcke on January 4, 1965.*

Local 13 asserts the impropriety of a lengthy telephone conversation between Bulcke, the Area Arbitrator, and Curt Johnston, then the president of Local 13, at the conclusion of the first day of the arbitration hearing. More specifically, it complains that, in encouraging Local 13 to continue with the arbitration and present a case in defense of Velasquez, Bulcke stated, "We know Pete Velasquez is guilty and he is going to have to receive some kind of penalty." It is indeed difficult to conclude that these comments tend to demonstrate in any way that the ILWU breached its duty of fair representation or engaged in a *Humphrey* type discrimination. Such statements, which in effect urged Local 13 to present the best possible case in behalf of one of its members, compel the conclusion that the Arbitrator was urging that the Union make an honest effort to serve the interests of each of its members without hostility or discrimination in spite of the futility of such an undertaking.

F. *The ILWU did not breach its duty of fair representation because of the statement made by the president of the ILWU in April, 1965.*

Local 13 asserts that Velasquez and Harry Bridges, president of the ILWU, engaged in a conversation at an ILWU caucus in April, 1965 in which Bridges emphatically criticized Velasquez' conduct, stated that the probable outcome of the Coast Arbitration would be his deregistration, and commented that he was the only person who would be able to help Velasquez in that event. In view of the Area Arbitrator's earlier finding

that Velasquez was guilty of ten of the twelve charges presented, it is not at all surprising that Bridges was able to accurately predict that the Coast Arbitrator would order Velasquez' deregistration. The additional assertion that Bridges alone would be in a position to help Velasquez in the event that he was deregistered was no more than a statement of the realities of organized labor. Admittedly the statements and predictions by Bridges were sternly issued and to the point, but it is not unrealistic to expect such candor between the president of a union and one of its members. It is a complete distortion to construe the comments as hostile or intimidating so as to come within the scope of Humphrey v. Moore, supra.

In view of the fact that Germain Bulcke had already found Velasquez guilty in eight out of ten complaints, it is not at all surprising that Harry Bridges could accurately predict that Professor Kagel would have no alternative under the *Pacific Coast Longshore Agreement* but to deregister Velasquez. Mr. Bridges was suggesting that the ILWU would try to negotiate with the PMA to get Velasquez reregistered. The ILWU caucus, composed of all longshore locals on the Pacific Coast, ultimately took the course of action suggested by Mr. Bridges. These efforts were blocked by the filing of this suit by Local 13. These facts establish that the ILWU was trying to help Velasquez in the way it felt was most likely to succeed; they show no breach of its duty of fair representation of Local 13 or Pete Velasquez.

G. *The ILWU did not breach its duty of fair representation by its handling of the "belly-packing" issue.*

Local 13 complains that the ILWU in effect "dumped" Velasquez' grievance in favor of another matter then in the grievance process. More specifically, it complains that the president of the ILWU made certain statements from which it could be inferred that the international union was more interested in a favorable disposition of the "belly-packing" prob-lem than on the issue of subjecting a union official to deregistration for repeated contract violations.

But this Court is not prepared to find a breach of the collective bargaining agent's duty of fair representation in its support of the position of one group of employees contrary to the interests of an individual worker whom it also represents. In Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), the Supreme Court found that the union had not breached its duty of fair representation in agreeing to an amendment of an existing collective bargaining contract, granting increased seniority to a particular group of employees and resulting in layoffs which otherwise would not have occurred.

"Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." Id., at 338, 73 S.Ct. at 686, 97 L.Ed. at 1058.

Conflicts between employees represented by the same union are to be expected, but to preclude the union from exercising its discretion in an instance such as this would only weaken the collective bargaining process and the grievance machinery.

The record before this Court indicates that the ILWU, in acting to benefit the largest possible number of employees in the bargaining unit, made its election honestly, in good faith and without hostility or abitrary discrimination. Accordingly, we are unable to conclude as a matter of law that the ILWU breached its duty of fair representation merely because it determined that a resolution of the "belly-packing" issue was more im-

portant to the bargaining unit than the Velasquez grievance.

There are no facts asserted, alleged or claimed that the choice was made by hostile or arbitrary discrimination or by dishonest or unfair motives or by any invidious, irrelevant or capricious action. In fact, the propriety of the ILWU's action, if it did what Local 13 says it did, is clear from Local 13's assertion that the choice in favor of the "belly-packing" issue was made because it involved more employees and was more important to the whole body of employees in the bargaining unit than the business agent issue.

H. *The ILWU did not breach its duty of fair representation by reason of the fact that PMA carefully considered its decision to press its complaints against Velasquez and seek his deregistration for violations while serving as a union business agent.*

■ Local 13 asserts that PMA's manager for the Southern California area commented that PMA's course of action —to pursue its complaints against Velasquez through the grievance procedure in an attempt to deregister him—was determined only after careful consideration. The short but effective answer to this line is that PMA was merely analyzing its labor relations policies, considering the effect of the implementation of those policies in this situation, and treating the Velasquez grievance as an important matter. The fact that PMA carefully considers its labor relation policies and the implementation of those policies in no way tends to show that the ILWU breached its duty of fair representation to Local 13 or Pete Velasquez.

I. *The ILWU did not breach its duty of fair representation by acquiescing in the Kagel arbitration.*

■ Local 13 contends that the Kagel award was "flagrantly against Union principles" so that the acquiescence in it by the ILWU, the ILWU caucus of longshore locals and Harry Bridges, was a breach of the ILWU's duty of fair representation. Let us try to pass over the first assumption of this argument—that a labor relations arbitrator of national prominence would enter an award that gratuitously violated "union principles" —and examine the other aspects of the claim. We do not believe that any court is in a position to say that it has the expertise to evaluate collective bargaining strategy and union principle better that Harry Bridges and the entire longshore caucus of the ILWU. Certainly not this Court. But if we should feel that we could not avoid disposing of such an issue, we would have to recognize that the Supreme Court has repeatedly stated that unions have a broad area of discretion in carrying on their collective bargaining. Ford Motor Co. v. Huffman, 345 U.S. 330, 337–339, 73 S.Ct. 681, 685–687, 97 L.Ed. 1048, 1057–1058 (1953); Humphrey v. Moore, 375 U.S. 335, 349–350, 84 S.Ct. 363, 372, 11 L.Ed.2d 370, 382 (1964); Vaca v. Sipes, 386 U.S. 171, 190–195, 87 S.Ct. 903, 216–219, 17 L.Ed. 2d 842, 857–860 (1967); International Longshoremen's & Warehousemen's Union v. Kuntz, 334 F.2d 165, 171 (9th Cir. 1964).

■ Yet it is not even necessary to rely on this discretion; the fallacy of Local 13's position is obvious. Plaintiff charges only that the ILWU is living up to its contract, for it provides that the arbitrator's award is final and binding in resolving disputes between the employees and the employers. To accept a "bad award", if we assume that the Kagel award is a "bad award", cannot be said to show hostile or arbitrary discrimination or dishonest or unfair motives or invidious, irrelevant or capricious action. "[A] breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious * * *." Vaca v. Sipes, supra, 386 U.S. at 195, 87 S.Ct. at 919, 17 L.Ed.2d at 860. If anything can be inferred from an honorable acquiescence in the award of the arbitrator, it is maturity in labor relations.

**J.** *The ILWU did not breach its duty of fair representation because of a conversation between Germain Bulcke and Professor Kagel after the Kagel award.*

▮ Plaintiff makes claims that the ILWU breached its duty of fair representation because Area Arbitrator Germain Bulcke talked to Coast Arbitrator Professor Sam Kagel after the decision of Kagel and stated that he, Germain Bulcke, was surprised at the severity of the penalty imposed by Professor Kagel. Local 13 further claims that Bulcke suggested that Kagel approach Bridges to see if Bridges would negotiate with St. Sure regarding the reregistration of Velasquez. These claims, if factual, have no relevance or materiality to the question of whether or not the ILWU breached its duty of fair representation of Local 13 or Pete Velasquez.

**K.** *The claim that the award is in manifest disregard of the collective bargaining agreement and the law does not raise any breach of ILWU's duty of fair representation.*

▮ It is well settled that where the parties to a collective bargaining contract have agreed to submit their disputes to final and binding arbitration, courts will not review the merits of any controversy so decided. Particularly, the court will not rehear or reweigh the evidence offered at the arbitration hearing. Nor will the court substitute its interpretation of the collective bargaining contract for that of the arbitrator. These principles have been stated by the United States Supreme Court in United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

The provisions of § 17 of the Pacific Coast Longshore Agreement are conced-ed by all to be part of the collective bargaining contract that applies to this controversy. By § 17.125 the Joint Port Labor Relations Committee is given the duty "to investigate and adjudicate any complaint against any longshoreman whose conduct on the job, or in the dispatching hall, causes disruption of normal harmony in the relationship of the parties hereto or the frustration and/or violation of the provisions of the working or dispatching rules or of this Agreement * * *". Section 17.24 provides that should the Joint Port Labor Relations Committee be unable to resolve the dispute, it may be immediately referred to the Joint Area Labor Relations Committee. Section 17.25 similarly provides that if the Joint Area Labor Relations Committee cannot resolve the dispute, it may then be referred to the Area Arbitrator for hearing and decision. Section 17.261 provides, "[A]ny decision of a Joint Port or Joint Area Labor Relations Committee or of any Area Arbitrator claimed by either party to conflict with this Agreement shall immediately be referred at the request of such party to the Joint Coast Labor Relations Committee. * * *" Further, § 17.27 provides that should the Joint Coast Labor Relations Committee be unable to agree on any question before it that question may be referred to the Coast Arbitrator for hearing and decision and continues, "[T]he decision of the Coast Arbitrator shall be final and binding." Section 17.51 provides, "[T]he powers of arbitrators shall be limited strictly to the application and interpretation of the Agreement as written. * * * The arbitrators shall have jurisdiction to decide any and all disputes arising under the Agreement including cases dealing with the resumption or continuation of work." Section 17.53 provides in part, "[T]he arbitrators shall have power to pass upon any and all objections to their jurisdiction."

Clearly, the parties to the Pacific Coast Longshore Agreement intended the grievance procedure with final and binding arbitration would be the exclu-

sive method for resolving disputes arising under that agreement.

Moreover, this Court is compelled to conclude that Section 11 of the Agreement expressly states the parties' intention, including the ILWU and its locals, that there shall be no work stoppages for the life of the Agreement and that, in the event of a grievance or dispute, the work shall continue in accordance with the Agreement.[17] And, as we have already seen, the grievance procedure set forth in Section 17 of the Agreement is the exclusive remedy for resolving all disputes or grievances.[18]

In view of the strong public policy in favor of utilizing grievance procedures to resolve disputes as well as the express language in the Agreement forbidding strikes or work stoppages, the commitment made by the ILWU in acquiescing in the award disciplining Velasquez for initiating and participating in work stoppages is clearly within the permissible area of a bargaining representative's discretion. Moreover, Local 13 has been unable to produce or cite any authorities suggesting that it is improper for unions to enter into commitments preventing work stoppages or subjecting those who participate in such disruptive activities to disciplinary action.

▇▇▇▇ Accordingly, and since the power of this Court to review the Arbitrator's award here at issue is limited by the rules enunciated in the cases cited above, we must conclude that plaintiff has not stated, alleged or claimed any facts whatsoever that would establish a cause of action for collateral attack upon the grievance procedure followed in this case and particularly upon the awards of the Coast Arbitrator and Area Arbitrator.

## V

There is no genuine issue as to any fact material to the amended complaint herein. The amended complaint and each and every cause of action therein alleged fails to state a claim upon which relief can be granted. Plaintiff is not entitled to any relief under or by virtue of the amended complaint and, in particular, is not entitled to any order or judgment setting aside or vacating the Coast Arbitrator's award dated June 29, 1965, or the Area Arbitrator's award dated February 13, 1965, or either of them.

## VI

There is no genuine issue as to any fact material to the cross-claim and counter-claim. Defendant, Cross-Claimant and Counter-Claimant Pacific Maritime Association is entitled to relief under and by virtue of the cross-claim and counter-claim and, in particular, is entitled to an order and judgment confirming and enforcing the Coast Arbitrator's award dated June 29, 1965.

## ORDER

By reason of the foregoing Decision, Findings of Fact and Conclusions of Law, it is hereby ordered that judgment be entered herein granting summary judgment against plaintiff and in favor of defendants upon the amended complaint herein, dismissing said amended complaint on the merits, and confirming and enforcing the Opinion and Decision of Sam Kagel, Coast Arbitrator, dated June 29, 1965.

Let judgment be entered accordingly.

17. Section 11, *Pacific Coast Longshore Agreement (1961–1966):*

"11.1 There shall be no strike, lockout or work stoppage for the life of this Agreement.

"11.2 The Union or the Employer, as the case may be, shall be required to secure observance of this Agreement.

"11.3 How work shall be carried on.

"11.31 In the event grievances or disputes arise on the job, all men and gangs shall continue to work as directed by the employer in accordance with the specific provisions of the Agreement or if the matter is not covered by the Agreement, work shall be continued as directed by the employer.

"11.32. There will be no unilateral 'hip pocket' working or dispatching rules."

18. Note 5, supra.

## APPENDIX I

| In the Matter of a Controversy between | |
|---|---|
| PACIFIC MARITIME ASSOCIATION, Complainant, and INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, Respondent, Involving Proposed deregistration of Pete Velasquez, No. 3349. | OPINION AND DECISION OF SAM KAGEL, Coast Arbitrator San Francisco, California June 29, 1965 |

ISSUE:

The issue in this case arises from a disagreement in the Coast Labor Relations Committee recited in Joint Exhibit 1, as follows:

"IN RE P. VELASQUEZ - REG. #31090 (LA 12-65)

The Committee now has before it the complete record made at the local and area level of the grievance machinery, including arbitration of the various complaints on which disagreement was reached. The record includes Minutes of Meeting of the Joint Longshore Labor Relations Committee, Los Angeles-Long Beach Harbor, Regular Meeting No. 194-64; Minutes of the Meeting of the Joint Area Labor Relations Committee, Los Angeles-Long Beach Harbor, Meeting No. 12-64; the Opinion and Decision of the Area Arbitrator (#5-65), dated February 13, 1965, with Reporter's Transcripts of Proceedings before the Arbitrator, dated January 4, 5 and 6, 1965; Referral of Dispute to Joint Coast LRC, LA 12-65, dated February 16, 1965; and Mr. Velasquez' Notice of Appeal to the Joint Coast LRC, dated February 23, 1965.

The Committee noted the Area Arbitrator found Mr. Velasques guilty in ten of the twelve cases presented for decision. It was further noted that some of the decisions establishing guilt were based solely on Section 17 of the Basic Agreement, while others were based on Section 17 and the August 25, 1960 Memorandum of Understanding. The Coast Committee agrees the matter is before the Coast Committee on the ten rulings of violation of Section 17.

Based on the record before this Committee, the Employers contended that Mr. Velasquez, Reg. No. 31090, is guilty of repeated violations of Section 17 of the Pacific Coast Longshore Agreement (1961–1966), and solely under this Section 17, moved for his deregistration.

The Union members of the Committee voted "no" and disagreement was reached."

AGREEMENT PROVISIONS:

The entire Agreement between the parties is applicable in this case. Specifically Section 17 is entitled "Joint Labor Relations Committee, Administration of Agreement and Grievance Procedures."

## PMA'S POSITION:

That the International Union has a responsibility in regard to longshore locals which includes the action of local officers; that Section 18 is a "Good Faith Guarantee"; that the parties agree to observe the Agreement in good faith and "The Union commits the locals and every longshoreman it represents to observe this commitment without resort to gimmicks or subterfuge"; that Section 11 provides that there shall be no strike or work stoppage for the life of the Agreement; that in case of grievances or disputes work shall continue; that Section 17 provides the exclusive remedy with respect to disputes; that pending investigation and adjudication of disputes work shall continue as directed and be performed as provided in Section 11; that Velasquez flagrantly ignored and violated the provisions of the Agreement, both as a working longshoreman and as a Union officer; that the Area Arbitrator found Velasquez guilty of violating the grievance procedure provisions in ten cases accruing over a period of seventeen months, nine of these cases occurring within a twelve-month period; that Section 17.81 provides that in an instance of deliberate repeated offenses a longshoreman can be deregistered.

## UNION'S POSITION:

That it agrees that Section 17.81 must be read to include Union officers even though not specifically so stated; that evidence, though not supplied at the hearing before the Area Arbitrator, indicates that Case No. 5 does not in fact implicate Velasquez; that Case No. 6 does not charge a violation of Section 17 but of the August 25, 1960 Memorandum; that the Employers unilaterally violated the Agreement when they sought to keep Velasquez from working as a longshoreman even though that violation was corrected by the Area Arbitrator; that the Area Arbitrator's decisions do not specify that Velasquez' violations were "deliberate"; that the cases are marginal cases; that the penalty of deregistration is too excessive a penalty.

## DISCUSSION:

*Area Arbitrator's Award of February 12, 1965:*

The following is a summary of the cases decided by the Area Arbitrator:

Case No. 1: Velasquez found not guilty of refusing to work as directed.

Case No. 2: The disposition by the Joint LRC on the complaints filed in 1959 and 1960 do not sufficiently support the Employers' contentions that Velasquez is a continuous and repeated offender.

Case No. 3: Velasquez did violate Sections 11.21, 11.31, 17.82 and 18.1 of the current agreement.

Case No. 4: The contention of the Employers that this gang, acting in concert with Velasquez as winch driver and steward, deliberately refused to work beyond 3:00 A.M. in violation of Section 3.142 and Section 11, and deliberately created a work stoppage, is sustained.

Case No. 5: The Employers' motion that "The business agent, Pete Velasquez violated the contract and the August 25, 1960 Settlement Agreement, Paragraph 4(d)", is sustained.

(The Union now claims that Velasquez was not on duty on the date involved as business agent.)

Case No. 6: The motion made by the Employers that the business agent, P. Velasquez "caused and participated in an illegal work stoppage" in violation of the August 25, 1960 Memorandum of Understanding, is sustained.

(The Union now argues that this decision was not a violation of the Basic Agreement between the parties.)

Case No. 7: Velasquez found to have violated Sections 11.13, 17.71 and 17.81 of the contract.

Case No. 8: Velasquez found guilty of creating a work stoppage in violation of the Agreement.

Case No. 9: Velasquez found guilty of violating provisions of Sections 11.2, 11.31, 15.1, 17.15, and participated in a refusal to work as directed thereby causing a work stoppage.

Case No. 10: Velasquez found guilty of creating a work stoppage in violation of Sections 11.31, 3.1362, 17.71 and 17.81.

Case No. 11: Velasquez found guilty of misconduct and causing and participating in a work stoppage in violation of the Agreement.

Case No. 12: Velasquez found guilty of creating and participating in a work stoppage in violation of the Agreement.

*Comment on Award:*

The Area Arbitrator's Awards covered incidents during a seventeen-month period. If we exclude from consideration Cases No. 5 and 6, Velasquez was still guilty of agreement violations in eight cases. Virtually all of them involved violations in failing to use properly the grievance procedure and causing illegal work stoppages. Velasquez caused these violations when a working longshoreman, a steward or Union officer.

*Standard of Conduct:*

The Agreement is specific and clear as to the manner in which grievances are to be processed. And is specific in prohibiting illegal work stoppages.

All longshoremen, while working as such, are required to observe all of the terms of the Agreement. Union officers, including stewards, are bound by an even higher standard of conduct than might, in some circumstances, be required of a working longshoreman. Officers and stewards have the affirmative duty to enforce the Agreements as written.

Velasquez was at times a working longshoreman, a steward and a Union officer. He was familiar with the Agreement machinery to process grievances. He knew that illegal work stoppages were prohibited. Clearly the applicable provisions of the Agreements on these matters were repeatedly called to his attention. However, he persisted in a course of conduct for which no excuse can be accepted. Nor was any in fact offered.

It is argued that deregistration is not in line with other penalties provided for in the Agreement for such offenses as pilferage, etc. However, the parties themselves agreed that deregistration was a proper penalty. Section 17.-81 provides in part that "Any employee who is guilty of deliberate bad conduct . . . through illegal stoppage of work . . . shall . . . for deliberate repeated offense [be] cancelled from registration."

For purposes of assessing a penalty this provision includes Union officers. They are employees only on leave when elected to Union office. They retain their rights under the Agreement. They also are bound by the obliga-

tions provided for in the Agreement to conduct themselves properly and not to cause illegal work stoppages.

This was clearly the intent of the parties derived from Section 17 and the tenor of the entire Agreement. The parties did not intend that a working longshoreman was to be prohibited from indulging in bad conduct and causing illegal work stoppages while at the same time a Union officer had an immunity as to such prohibited conduct. Or that the Union officer could escape the penalty that could beset a working longshoreman for such prohibited conduct. The Union concedes this.

The Area Arbitrator's Awards found Velasquez guilty in case after case of having violated Section 17 of the Agreement. Velasquez' course of conduct consisted of deliberate repeated offenses in causing illegal work stoppages. The penalty which the parties themselves wrote into the Agreement for such conduct is proper and appropriate in this case.

DECISION:

The Employers' motion to deregister Pete Velasquez, Reg. No. 31090, is granted and he shall be deregistered forthwith.

(s) Sam Kagel
Coast Arbitrator

———◆———

APPENDIX II

IN ARBITRATION PROCEEDINGS PURSUANT TO CURRENT
PACIFIC COAST LONGSHORE AGREEMENT

| | |
|---|---|
| IN THE MATTER OF A CONTROVERSY<br>Between<br>PACIFIC MARITIME ASSOCIATION,<br>Complainant,<br>and<br>INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, LOCAL 13,<br>Respondent.<br>ISSUE: Employers' Complaints Filed Against Pete Velasquez #3349, (New No. 31090) Claiming Violations of Current Agreement. | #5-65<br>OPINION AND DECISION<br>of<br>GERMAIN BULCKE,<br>Area Arbitrator<br>Wilmington, California<br>February 12, 1965 |

*These hearings* were held in the P.M.A. Conference Room on January 4, 5, 6, 1965, in accordance with an agreement reached at the Joint Area L.R.C. Meeting #12–64, dated December 14, 1964. Appearances are recorded in the transcript.

*The Minutes* of the Joint Area L.R.C. Meeting #12–64 dated December 14, 1964, record that, "The Employers requested that a Court Reporter be utilized for a transcript of the hearings on complaints filed against P. Velas-

quez, #3349, which involve the Employer motion for his deregistration. Union held this request in abeyance."

*At the beginning* of this hearing, the Union stated that they did not believe a transcript should be made.

*The Employers'* position was that the dispute was of general significance (Section 17.64); that the formal procedure would be necessary to settle the issue, and a transcript should be made.

*The Arbitrator* sustained the Employers' position, and a full and complete record of the proceedings was made by a Certified Shorthand Reporter.

*It should be noted* that shortly before the conclusion of the first day's session (January 4) the Union stated that, "Local #13 will not participate in any arbitrations in regard to Mr. Velasquez as he was employed as a Business Agent of the night side, representing Local #13 as an independent Business Agent, and we are not going to participate in arbitrations regarding these complaints." (TR. P. 121)

*The Employers* then stated, "Under these circumstances the Employers have no choice but to insist that in view of the flat refusal of the Union to participate in any further hearings of these disputes, that these hearings be continued on an ex parte basis." (TR. P. 125–126)

*During the second* day's hearing (January 5), Mr. MacEvoy for the Employers, stated, "We would then have to ask the arbitrator to rule as to whether or not he will hear these cases ex parte. I believe that Section 17.61 is here involved." (TR. P. 170)

*The Arbitrator* ruled that in accordance with the provisions of Section 17.61, these hearings would be continued on an ex parte basis. (TR. P. 171, 172) Thus, the remaining 8 Employer complaints were heard on an *ex parte basis.*

*It was agreed* and understood that any findings made by the Arbitrator based on the complaints, testimony, and the record made in these hearings will deal only with Pete Velasquez and not with any other person or persons or gangs that may be named as being involved in the same situation. (TR. P. 202–203)

*Case #1* Involves Employer Complaint #212, Minutes of Joint L.R.C. Meeting #129–64, dated August 26, 1964, Item #14 - Page 5, record as follows:

"E. C. #212—P. VELASQUEZ, #3349, F. PATRICIO, #2993—REFUSAL TO WORK AS DIRECTED—S. S. GERINA, BERTH #231—7/11/64—CRESCENT WHARF & WAREHOUSE COMPANY.

Messrs. Velasquez and Patricio, deckmen in M.U. #1 in #3 Hatch, were directed to work extended time to finish and sail vessel. They called replacements at 3:00 A.M., without sufficient reason. Their replacements arrived at 3:15 A.M., but were not accepted by the Employer. The men left the job, resulting in loss of the gang because of insufficient men to continue work. Disagreement reached."

*Minutes* of Joint L.R.C. Special Meeting #152–64, dated October 1, 1964, record that E.C. #212 was discussed; no agreement reached, and the complaint referred to the Area L.R.C. for disposition.

*Minutes* of Joint Area L.R.C. #12–64, dated December 14, 1964, record that disagreement was reached and the Employers referred the complaint to arbitration.

*OPINION AND DECISION:*

Having carefully studied the lengthy record made (TR. P. 3–34), it is the Arbitrator's decision that Pete Velasquez had a reasonable and bona fide purpose for leaving the job and replacing himself at 3:00 A.M., and is not guilty of refusing to work as directed as claimed in E.C. #212.

*CASE #2* The Employers submitted copies of Minutes of the Joint L.R.C. Meetings #35–39, dated April 7, 1959, and Joint L.R.C. #41–62, dated April 11, 1962.

*Minutes #35–59* record the following:

"Sp. E.C. #61 complaint by West Coast Terminals against P. M. Velasquez, #3349, working aboard the S.S. JAPAN BEAR during the night shift of February 19, 1959. The complaint states that Pete Velasquez failed to show back on the job at 11:00 P.M., following the evening meal period. The remainder of the gang would not work with a replacement, and quit. *Disposition:* #3349 was reprimanded by the Union and instructed to report to future jobs on time."

*Minutes #41–62* record the following:

"E.C. #386. This complaint was filed by Associated-Banning Co. against the Union business agent for violation of Section 16(B) of the Basic Longshore Agreement and the August 25, 1960 Settlement Document." The complaint states that the Union business agent boarded the S.S. LOCH LOYAL at Berth 190 on September 11, 1960 without notifying company supervision that he was on the job. The Committee agreed the contract provision must be complied with. The provision states that: "In order that the Employer may cooperate with the business agent in the settlement of disputes, the business agent shall notify the representatives designated by the Employers before going on the job."

"The Committee agreed that on the basis of this understanding, the complaint is resolved."

*OPINION AND DECISION:*

The record shows that the purpose for the introduction by the Employers of the Minutes of L.R.C. recording the disposition of the complaints filed against Pete Velasquez as a part of his work record, was to establish the Employers' contention that he is a continuous and repeated offender.

*It is the Arbitrator's* opinion and decision that the Minutes of the L.R.C. clearly record that the Joint L.R.C. Committee had agreed that Pete Velasquez had been found to have violated the provisions of the Longshore Coast Agreement and as such it becomes part of his work record. However, the disposition by the Joint L.R.C. on the complaints filed in *1959* and *1960* do not sufficiently support the Employers' contention that Pete Velasquez is a continuous and repeated offender.

*CASE #3* E.C. #373—Minutes of Joint L.R.C. Meeting #194–64, dated December 3, 1964, record the following:

"E.C. #373—U.C. #634—GANG #55—REFUSAL TO WORK AS DIRECTED—S.S. PRESIDENT QUEZON, BERTH 144—12/1/64, MARINE TERMINAL CORP.

The Employer complaint states that: Gang #55 was turned to at 6:00 P.M. on the PRESIDENT QUEZON and assigned to work in #4 hatch.

They refused to work this hatch, demanding that the midshift boom be given a static test, due to the fact that the day gang had dropped the boom at approximately 8:00 A.M. that morning. Gang #55 was shifted to #6 hatch while a Special L.R.C. Meeting was held to discuss the validity of the gang's claim that the gear was unsafe to work. After the committee had reached disagreement with respect to the safety of the operation, an arbitration was held. The Arbitrator ruled that the boom was not unsafe and the men were to turn to and work as directed by supervision. The men were directed to turn to at 11:00 P.M. and refused, resulting in each man being fired for refusing to abide by the Arbitrator's decision to work #4 hatch as directed by supervision, thereby creating a work stoppage and delaying the departure of the vessel.

Disagreement reached, and referred to Area L.R.C."

Minutes of Joint Area L.R.C. #12–64 dated December 14, 15, 1964 record that disagreement was reached on E.C. #373—U.C. #634, and following disagreement, the Employers referred complaint to arbitration.

### OPINION AND DECISION:

The position and contentions of the parties regarding the above noted complaints was discussed at great length during these hearings (TR. P. 66–118). Having considered the record made, it is the Arbitrator's decision that Pete Velasquez by his actions *did violate* Sections 11.21, 11.31, 17.82 and 18.1 of the Current Agreement.

### CASE #4 E.C. #363—IMPROPER ORDERING OF REPLACEMENTS— S.S. MICHIGAN 11/23/64—CRESCENT WHARF & WAREHOUSE COMPANY.

*The Minutes* of Special L.R.C. #189–64 record that the issue was discussed but no agreement reached.

*The Minutes* of the Joint Area L.R.C. record that disagreement was reached on E.C. #363, and following disagreement the Employers referred the complaint to arbitration; also, following discussion of several tentative dates, the committee agreed that an arbitration hearing would be scheduled starting at 10:00 A.M. Monday, January 4, 1965.

*At this hearing*, January 4, 1965, it was stated that the above noted minutes had not been signed. The parties, in accordance with a suggestion made by the Arbitrator, held a meeting on the morning of January 5, in order to get minutes acceptable to both sides. They were not successful. The following statement was made by Mr. MacEvoy for the Employer: "It is unfortunate that the parties were unable to reach agreement on the minutes, the draft minutes of meeting of November 24, but we believe that the case can be heard on the basis of a stipulation by both parties that the case has been heard at the local level and has been heard at the Area level on December 14, and the Employers would offer this stipulation if the Union is willing to so stipulate."

Mr. Johnston: "All right." (TR. P. 130–131)

The Employers stated that, "In the case of the S.S. MICHIGAN, we have an Employer complaint, E.C. #363, filed by Crescent Wharf & Warehouse Company, dated November 24, 1964, involving a dispute on the S.S. MICHIGAN at Berth Long Beach 4. The complaint states, after listing the names and work numbers and categories of the men in Ship Gang #55, including hatch tender, winch driver, four holdmen, four swingmen

and two frontmen: 'The above men were directed to work extended time to finish the vessel for sailing. They all called replacements for 3:00 A.M. The replacements were not accepted by the Employer and the above men refused to continue work and walked off the job.' (TR. P. 131)

"It is the Employers' contention that this gang, acting in concert, with Mr. Velasquez as winch driver and steward, deliberately refused to work beyond 3:00 A.M., in violation of Section 3.146, and Section 11 and deliberately created a work stoppage aboard the vessel." (TR. P. 136)

*OPINION AND DECISION:*

The above case, E.C. 363, was discussed at great length (TR. P. 131–170). The Arbitrator noted that a copy of a letter was submitted by Mr. Velasquez as the reason why he deemed it necessary to replace himself at 3:00 A.M. The letter reads as follows:

"Dear Sirs: This is to verify that Mr. and Mrs. Pedro Velasquez had an appointment with me on November 24, 1964, at 9:00 A.M. This appointment was made November 22, 1964, and was kept by Mr. and Mrs. Velasquez. Sincerely yours, Roy Shaw, Real Estate, Donald W. Shaw. Dated December 10, 1964." (TR. P. 141)

The record, however, clearly shows that the gang, including P. Velasquez, had taken the position that they did not intend to work extended time, but would only work to fulfill the eight-hour guarantee.

*The contention* of the Employers that this gang, acting in concert, with Mr. Velasquez as winch driver and steward, deliberately refused to work beyond 3:00 A.M. in violation of Section 3.142, and Section 11, and deliberately created a work stoppage, *is sustained.*

It must be noted that all the remaining cases were heard *on an ex parte basis.*

*CASE #5* E.C. #196—REFUSAL TO WORK AS DIRECTED—S.S. KOREAN BEAR BERTH S.P. 91, S.S. PRESIDENT HAYES, BERTH S.P. 93–B 8/4/63—ASSOCIATED BANNING COMPANY.

*Minutes* of Joint L.R.C. Sp. Meeting #192–63, November 12, 1963, record that disagreement was reached and the complaint referred to Area L.R.C.

*Minutes* of the Area L.R.C. Meeting #2–64, February 21, 1964, on E.C. #196, record that:

"The Committee agreed that in accordance with Section 3.143, men and/or gangs may be ordered to shift from a job or ship where they have not completed their original assignment to permit a late start on another job or ship or in order to fill out the 8-hour guarantee, or in order to finish the second ship for shifting or sailing. The Committee also agreed that the men involved in this complaint were obligated to shift to the S.S. PRESIDENT HAYES for working an extended shift in order to finish this vessel for sailing.

"Employers moved that the business agent, Pete Velasquez, violated the contract and the August 25, 1960 Settlement Document, Paragraph 4(d) by improperly directing the men to leave the job, thereby precipitating the work stoppage on this job. The Employers moved that the four men involved, and the Union business agent, Pete Velasquez, be

assessed the penalty of five days off all work with 40 hours added to their check-in time.

"The Union disagreed with the Employers' motion, stating it was their understanding the four men involved in this complaint were innocent victims of circumstances. Union stated a thorough investigation revealed that the men followed erroneous instructions.

"Following disagreement the dispute was referred to the Area Arbitrator for decision."

## OPINION AND DECISION:

The record clearly shows that the Area L.R.C. agreed that the four men involved should have shifted and worked to finish the second ship for sailing, and did violate Section 3.143. The statement by the Union that the men followed erroneous instructions issued by the business agent fully support the Employers' contention that the business agent improperly directed the men to leave the job, resulting in a work stoppage. The Employers' motion that "The business agent, Pete Velasquez, violated the contract and the August 25, 1960 Settlement Agreement, Paragraph 4(d)" *is sustained.*

## CASE #6 E.C. #30—REFUSAL TO WORK AS DIRECTED/WALK OFF —S.S. PRESIDENT MCKINLEY, BERTH 93-B, 1/22/64, ASSOCIATED BANNING CO.

This complaint was discussed in the Joint L.R.C. Meeting #15–64, February 5, 1964. The details are recorded in the minutes of that meeting and the Employers made the following motion that:

"The Union business agent, P. Velasquez, be assessed the appropriate time off under Section 4(d) of the August 25, 1960 Memorandum of Understanding for causing and participating in an illegal work stoppage."

The Union voted "No" on the Employers' motion and the issue was referred to the Area L.R.C. for disposition.

*The Minutes* of the Joint Area L.R.C. Meeting #5–64, May 6, 1964, record that E.C. #30 was discussed and the Union voted "No" on the above quoted Employer motion, and the complaint was referred to arbitration.

## OPINION AND DECISION:

The record made in this hearing clearly establishes that the business agent, P. Velasquez, failed to follow the steps of the grievance machinery. The motion made by the Employers that the business agent, P. Velasquez "caused and participated in an illegal work stoppage" in violation of the August 25, 1960 Memorandum of Understanding, *is sustained.*

## CASE #7 E.C. #21—SHIP GANG #62—REFUSAL TO WORK SHORT-HANDED—S.S. CALEDONIA STAR—BERTH 228 E, 1/15/64 —MARINE TERMINALS CORP.

*The Minutes* of Joint L.R.C. Meeting #8–64, January 22, 1964, record in detail the discussion on this complaint by the Committee; also, that the Employers made three motions on which the Union voted "No." The Committee agreed to refer the entire matter to the Area L.R.C.

*The Minutes* of Area L.R.C. Meeting #4–64, April 30, 1964, record that following a review of Employer Complaint, E.C. #21, the Employers repeated the motions made in the L.R.C. Meeting #8–64, 1/22/64,

with the Union voting "No." The Employers referred the complaint to arbitration.

*It was agreed* in this hearing that only the motion dealing with P. Velasquez was before the Arbitrator (TR. P. 202–203). The motion reads as follows:

"That the business agent, P. Velasquez, be assessed the appropriate time off under Section 4(d) of the August 25, 1960 Memorandum of Understanding for causing and participating in an illegal work stoppage in violation of Section 11.31, Section 17.71 and Section 17.81 of the Contract."

*OPINION AND DECISION:*

The record made at this hearing fully supports the Employers' contention that the business agent, P. Velasquez, by his actions had violated Sections 11.13, 17.71 and 17.81 of the Contract. The above quoted motion made by the Employers as recorded in the Area L.R.C. Minutes #4–64, April 30, 1964, *is sustained.*

*CASE #8* E.C. #109—PETE VELASQUEZ, #3349, BUSINESS AGENT —CREATING A WORK STOPPAGE—S.S. MANKATO VICTORY—VIOLATION OF AUGUST 25, 1960 SETTLEMENT DOCUMENT, 3/24/64, MARINE TERMINALS CORP.

*This Complaint* was discussed in the Special L.R.C. Meeting #52–64, April 17, 1964. The minutes of that meeting record that disagreement was reached on the following Employers' motion:

"Employers move that Mr. Velasquez, #3349, be assessed the appropriate penalty for improperly instructing the gang, thereby disregarding the interests of the Employer and disrupting the normal harmony of the operation by creating a work stoppage in violation of Sections 11.31, 17.81, 17.83, and the August 25, 1960 Settlement Document. The Complaint was referred to Area L.R.C. for disposition."

*The Minutes* of the Joint Area L.R.C. #7–64, June 23, 1964, record that on E.C. #109 disagreement was reached, with the Union voting "No" on the above quoted Employer motion. "The Employers referred the complaint to arbitration."

*OPINION AND DECISION:*

The Minutes of the L.R.C. and Area L.R.C. and the record made in this hearing clearly establish that the business agent, Pete Velasquez, is guilty of creating a work stoppage in violation of the provision of the Current Agreement. The above quoted motion made by the Employers in the Area L.R.C. Meeting #7–64, June 23, 1964, *is sustained.*

*CASE #9* E.C. #170—P. VELASQUEZ, NIGHT BUSINESS AGENT— CREATING A WORK STOPPAGE IN VIOLATION OF CONTRACT—S.S. KOHKA MARU, BERTH L.B. #28, 6/3/64— METROPOLITAN STEVEDORING COMPANY.

*The Minutes* of Joint L.R.C. Special Meeting #82–64, June 4, 1964, record that disagreement was reached on a motion made by the Employers in connection with the above quoted complaint (E.C. #170). The motion reads as follows:

"The Employers move that P. Velasquez, ILWU Local #13 business agent, violated the provisions of Sections 11.2, 11.31, 15.1 and 17.15, and by participating in a refusal to work as directed, thereby caused a work

stoppage in violation of the August 25, 1960 Settlement Document, Section 4(d) anld is subject to the appropriate penalty spelled out in Paragraph 4 of this Agreement.

"The Complaint was referred to Area L.R.C. for disposition."

*The Minutes* of Area L.R.C. Meeting #10–64, November 9, 1964, record that on the identical motion made by the Employers on E.C. #170, the Union voted "No" and the complaint was referred to arbitration.

OPINION AND DECISION:

The record made in this hearing shows that the Area L.R.C. in Meeting #10–64, November 9, 1964, agreed that in E.C. #168 and #169, the men involved in the refusal to work as directed on the S.S. KOHKA MARU, were found guilty and the complaints were "resolved with loss of wages for the remainder of the work shift as sufficient penalty in this case."

The above quoted action by the Area L.R.C. clearly establishes that the normal procedure for handling disputes was not followed by the business agent, P. Velasquez, and the motion made by the Employers in the Area L.R.C. Meeting #10–64, November 9, 1964, on E.C. #170, *is sustained.*

CASE #10 E.C. #50—P. VELASQUEZ, #3349, NIGHT BUSINESS AGENT—S.S. ORNEFJELL, BERTH T.I. 262, 1/10/64—MARINE TERMINALS CORP.

*This complaint,* E.C. #50, was first discussed in the Joint L.R.C. Meeting #52–64, April 17, 1964. The minutes of that read in part that:

"Union business agent refused to permit gang to complete this work in accordance with Section 3.1362 of the Contract, thereby creating a work stoppage and delay to the vessel."

Also, "The Employers moved that Mr. Velasquez, Union business agent, be assessed the appropriate penalty for ordering this gang off the vessel, thereby creating a work stoppage in violation of Sections 11.31, 3.1362, 17.71, 17.81, and the August 25, 1960 Settlement Document."

Disagreement was reached and the complaint was referred to the Area L.R.C. The complaint was discussed at several Area L.R.C. Meetings and following disagreement reached in Area L.R.C. Meetings #12–64, December 14, 1964, the Employers referred the complaint to arbitration.

OPINION AND DECISION:

The record made at this hearing does establish the fact that the shifting of the gang from the PHILIPPINE PRESIDENT GARCIA to the ORNEFJELL under the existing circumstances resulted in a gear priority violation. The proper procedure was for the Union to file a complaint with the Joint L.R.C. The fact that the gang was transferred back to the original vessel does in no way justify the action of the business agent in instructing the gang to refuse to continue working on the ORNEFJELL.

The motion made by the Employers as recorded in the minutes of the Joint L.R.C. Special Meeting #52–64, April 17, 1964, "That Mr. Velasquez, Union business agent, be assessed the appropriate penalty for ordering this gang off the vessel, thereby creating a work stoppage in violation of Sections 11.31, 3.1362, 17.71, 17.81 and the August 25, 1960 Settlement Document" *is sustained.*

*CASE #11* E.C. #101—P. VELASQUEZ, #3349—MISCONDUCT, CAUSING AND PARTICIPATING IN A WORK STOPPAGE— S.S. MORMACWIND, BERTH 146—3/26/64, CRESCENT WHARF & WAREHOUSE CO.

*The details* of E.C. #101 are recorded in the L.R.C. Minutes of Special Meeting #28–64, 3/11/64, L.R.C. #197–64, December 11, 1964 and Area L.R.C. Meeting #12–64, December 14, 1964. The Area L.R.C. Minutes of Meeting #12–64, December 14, 1964, record that disagreement was reached, and the Employers referred the complaint to arbitration.

*OPINION AND DECISION:*

The signed minutes of L.R.C. Special Meeting #28–64, 3/11/64, clearly state that it was the Union's position that the teamsters were performing work in violation of Section 1.25 of the P.C.L.A.; further, that the Union business agent had stopped the teamsters from continuing the operation.

The transfer of the cargo from stevedore boards to teamster board by the teamsters was not in violation of the Current Agreement but was in accordance with the provisions of Sections 1.25 and 1.44.

*The claim* by the Employers that P. Velasquez is guilty of misconduct and causing and participating in a work stoppage in violation of the Agreement *is sustained.*

*CASE #12* E.C. #233—WORK STOPPAGE—S.S. INDIA BEAR, BERTH #91, 7/29/64, ASSOCIATED BANNING COMPANY.

*The details* of E.C. #233 are recorded in the Minutes of L.R.C. Special Meeting #121–64, August 12, 1964. Disagreement was reached and the Employers referred the complaint to Area L.R.C. for disposition.

*The Minutes* of Area L.R.C. Meeting #12–64, December 14, 1964, record that disagreement was reached and the Employers referred the complaint to arbitration.

*OPINION AND DECISION:*

The record made in this hearing clearly supports the Employers' position that Mr. Velasquez created and participated in a work stoppage, by instructing Ship Gang #9 to walk off the job in violation of the Contract.

*The Employers'* motion, recorded in the Minutes of L.R.C. Special Meeting #121–64, August 12, 1964: "That Pete Velasquez, business agent, created and participated in a work stoppage by instructing ship gang #9 to walk off the job in violation of the Contract and is thereby subject to the applicable penalties specified in the Pacific Coast Longshore Agreement and the August 25, 1960 Settlement" *is sustained.*

DATED: February 13, 1965.

/s/ Germain Bulcke
Germain Bulcke, Area Arbitrator