TULLY, Appellant, v. FRED OLSON MOTOR SERVICE COMPANY and another, Respondents.

*November 1—November 28, 1967.*

81

82

For the plaintiff-appellant there were briefs by *Bernstein, Wessel & Lewis* and *John H. Wessel,* all of Milwaukee, and oral argument by *John H. Wessel.*

For the defendant-respondent Fred Olson Motor Service Company there was a brief by *Quarles, Herriott, Clemons, Teschner & Noelke,* attorneys, and *L. C. Hammond, Jr.,* and *John S. Holbrook, Jr.,* of counsel, all of Milwaukee, and oral argument by *Mr. Holbrook.*

For the defendant-respondent Chauffeurs, Teamsters & Helpers "General" Local No. 200 there was a brief by *Goldberg, Previant & Uelmen,* and oral argument by *Gerry M. Miller,* all of Milwaukee.

HANLEY, J. The principal issue before us on this appeal is whether the defendants, Olson and the union, are entitled to summary judgment based upon the affidavits submitted.

The first step in reviewing a summary judgment case is to determine whether the affidavits in support of the motion make out a prima facie case for summary judgment. *Peterson v. Maul* (1966), 32 Wis. 2d 374, 145 N. W. 2d 699; *Leszczynski v. Surges* (1966), 30 Wis. 2d 534, 141 N. W. 2d 261. Accordingly, a brief resumé of the supporting affidavits will be given here.

The affidavit of Robert Shaffer, in support of Olson's motion for summary judgment, alleges that on April 4, 1961, he was an employee of Olson, working in the capacity of dispatcher. It was his job to deliver assign-

ments to the drivers of the various runs or trips made by the company. He further alleges that on the evening of April 4, 1961, the runs scheduled were: One to Chicago, Illinois; three to Hammond, Indiana; and one to Kankakee, Illinois. There were five drivers scheduled to drive the trailers to those destinations, including the plaintiff, one of whom had greater seniority than Tully. Pursuant to his request, the senior driver was assigned the run to Chicago; and the next three (including Tully) were assigned the Hammond run. The man with the least seniority was assigned the Kankakee run. When Tully reported for work, Shaffer delivered him the necessary papers. At that time Tully demanded the right to make a trip to Chicago and walked off the premises. Shaffer finally alleged that he reported the incident to Robert W. Gleason, vice-president of Olson, the next day.

The affidavit of Robert W. Gleason, in support of Olson's motion for summary judgment, states that pursuant to agreement between the company and the union and pursuant to the contract, there existed a nine-hour guarantee for compensation to each truck driver employed by the company handling each trip to Chicago, Illinois; Hammond, Indiana; or Kankakee, Illinois. In the event the time consumed for making any such trip exceeded nine hours, the compensation was to be for the period of time elapsing between the time the driver punched in and punched out. Also pursuant to the agreement, assignments to the various daily runs were made to the drivers commencing work at a given starting time on the basis of their preference in accordance with their respective seniority. When, on April 5, 1961, Shaffer notified Gleason that Tully had refused to make the Hammond run on the previous evening, Gleason notified Tully that the company considered Tully's employment terminated. A grievance was processed on the local level, subsequent to which a complaint was filed with the Wisconsin joint state committee. On May 3, 1961, a meeting of the com-

mittee was held in Milwaukee at which Tully's case was reviewed. The minutes of the meeting with reference to Tully's grievance are as follows:

"Eighth case:
"Local Union No. 200 –vs– Fred Olson Motor Service in favor of Loren Tully—alleged violation of Article 5, Section 1 of the Over-the-Road Contract.
"Employers committee: Mr. Wendell Knox, Knox Motor Service, Inc.; Mr. Charles Redel, Gateway Transportation Company; Mr. Joe Zebrowski, Express Freight Lines, Inc.
"Union committee: Mr. Jim Luckey, Local Union No. 563; Mr. Milton Veleke, Local Union No. 662; Mr. Emmett Terry, Local Union No. 75.
"Mr. Frank Ranney represented the union and stated that Mr. Tully came in to work and was given a load; that he refused to take the load and went home.
"Mr. Tully appeared on his own behalf and presented a letter which he had received from Olson Motor Service which stated that they agreed with him that he had quit his job; that he refused to pull a load from Milwaukee to Hammond and return; that he did not feel he should have to pull a run which is 60 miles further than a Chicago turn. He stated that the Hammond run paid on a punch-to-punch basis, whereas the Chicago run paid a nine-hour guarantee.
"Mr. Roy Lane made the observation that both Chicago and Hammond turns pay nine hours including preparation time, plus the man is paid for work time in addition to the nine hours.
"Mr. Tully stated that he did not sign for the Hammond runs and did not have to take them. He admitted that he was not ill at the time he was given the Hammond run question and could have run it if he so desired.
"Mr. Robert Gleason represented the company and stated that if a man refuses to work, the company considers that the man has quit his job. He stated that the company does not feel that the men should be allowed to choose their runs; that they must take what is available. He stated that one man junior to Tully took a Chicago turn with a pickup enroute; two men junior to Tully made Hammond turns and one man junior to

Tully made a Kankakee turn; that as a result of Tully refusing this run, the company had to take a Chicago run away from a senior man and hold it for the next day and had to send the senior man out on the Hammond run that Tully was to have taken.

"Decision: It was the unanimous decision of the committee that on the grounds that there was no discrimination or preference shown, and that the only run available was the Hammond run in question which employee Tully refused to take, the company's contention is upheld."

Gleason's affidavit alleges that the minutes accurately reflect the substance of what transpired at the meeting. The affidavit finally alleges that at no time did Gleason or any other employee of the company enter into any agreement with the union regarding the disposition of the complaint of Tully regarding the termination of his employment.

The affidavit of attorney Laurence C. Hammond, Jr., in support of Olson's motion for summary judgment, consists primarily of a portion of a deposition of Tully taken pursuant to sec. 887.12, Stats., in which Tully stated that Roy Lane, president of Local 200, and Frank Ranney, secretary-treasurer of Local 200, were involved in a conspiracy with unknown company officials; that a fellow driver, Clayton McCann, told him that a meeting was held on company premises and that he, Tully, was "all set for the hatchet;" that Tully believed that there was a conspiracy because the grievance form prepared by his local union indicated that it was the local's position that Tully did not quit; and yet the union representatives on the committee (none of whom were from Tully's local) voted against him; and that he believed there was a conspiracy against him also because he was instrumental in retaining a contract provision called the "Milwaukee Rider." The deposition also indicated that he "did not remember" any particular meetings between Olson and Local 200 where they attempted to secure his discharge.

The affidavit of Roy Lane, president of Local 200, in behalf of Local 200's motion for summary judgment states that Lane had the responsibility of processing Local 200's grievances and reiterates much of what previous affidavits alleged concerning the Central States Area Over-the-Road Motor Freight Agreement and concerning what factually occurred on April 4, 1961. It additionally states that Tully telephoned Lane the night of April 4th and was told by Lane to return to work and was informed that a grievance should be filed. Lane then received a letter from Olson advising him that the company deemed that Tully voluntarily terminated his employment, whereupon Lane prepared and submitted a grievance. The affidavit then states that plaintiff was notified by registered mail that his grievance would be submitted to the joint state committee on May 3, 1961. Lane attended the committee meeting and affied that Tully was afforded a full opportunity to be heard and that representatives of Local 200 also appeared and requested that the grievance be sustained. According to Lane, Tully did not assert that he was unable because of illness to take the Hammond run nor that a Chicago run was available to him at the starting time assigned to him. The affidavit finally alleges that Lane did not conspire with Olson to remove Tully from Olson's employ nor to his knowledge did any other representative of the local and that neither Lane nor any other representative of the local ever refused to permit Tully to file a grievance or to process it.

The affidavit of Thomas J. Duffey, in support of the defendant Local 200's motion for summary judgment, alleges that in 1961 Duffey was the general manager of the Motor Carriers Labor Advisory Council, an association of trucking industry employers which negotiated and administered the Over-the-Road Motor Freight Agreement, and that he was secretary of the Wisconsin joint state area committee with the responsibility to record the minutes of its meetings. In his capacity as

secretary, he attended a meeting of the committee on May 3, 1961, and was present during a hearing and decision on the grievance of Tully. Duffey alleges that Frank Ranney presented the facts supporting the grievance; that Tully was present during all of the evidence relevant to his case and spoke on his own behalf and that Gleason spoke on behalf of Olson. The affidavit further states that Tully never asserted that a conflict of interest existed between Local 200 and himself which prevented a fair representation or decision or claimed that a conspiracy was afoot between Olson and Local 200, that Tully did not deny that he refused to perform work on April 4, 1961. The affidavit also alleges that the decision of the committee was unanimously against Tully and that the minutes, which are also annexed to this affidavit, accurately reflect the proceedings.

The affidavit of David L. Uelmen, in support of Local 200's motion for summary judgment, consists principally of two depositions of Tully at which he testified concerning what happened on April 4, 1961, what occurred at the grievance procedure before the joint state committee, and why he thought there was a conspiracy against him. It is consistent with the facts adduced in the above affidavits.

We are of the opinion that these affidavits showing as they do the minutes of the joint state committee meeting and that Tully was present and had an opportunity to present his views and that the grievance was processed as far as the union was able [1] constitutes a prima facie

---

[1] Article 8 of the Central States Area Over-the-Road Motor Freight Agreement indicates the procedure to be followed in processing grievances:

"The Union and the Employers agree that there shall be no strike, lockout, tie-up, or legal proceedings without first using all possible means of a settlement, as provided for in this Agreement, of any controversy which might arise. Disputes shall first be taken up between the Employer and the Local Union involved. Failing adjustment by these parties, the following procedure shall then apply:

case for summary judgment on the cause of action relating to the duty of fair representation on the part of the union.

In *Humphrey v. Moore* (1964), 375 U. S. 335, 84 Sup. Ct. 363, 11 L. Ed. 2d 370, an action was brought to enjoin implementation of the decision of a joint employer-employee committee purporting to settle certain grievances in accordance with the terms of a collective-bargaining agreement. The decision of the committee determined the relative seniority rights of employees of two companies, one of which was absorbing the business of the other. One union represented both groups of employees. The union first indicated that it would support the position of the employees of one company but after apprising itself more fully of the facts, supported the position of the employees of the second company. The class action was brought by employees of the first company when the committee decided adversely to their interests, alleging that the union in deceiving the plaintiffs left them without representation before the committee.

After the court declared there was insufficient proof of dishonesty, it addressed itself to the question of inadequacy of representation. The court stated as follows at page 349:

". . . But we are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some

"(a) Where a Joint State Committee, by a majority vote, settles a dispute, no appeal may be taken to the Joint Area Committee. Such a decision will be final and binding on both parties. Provided, however, that the Joint Area Committee shall have the right to review and reverse any decision of the Joint City or State Committee and make a final decision on the case if the Joint Area Committee has reason to believe the decision was not based on the facts as presented to the City or State Committee or in the possession of either party and not presented to the City or State Committee, provided further, however, that such action by the Joint Area Committee may be taken only by unanimous vote."

individuals whom it represents nor in supporting the position of one group of employees against that of another. In *Ford Motor Co. v. Huffman,* 345 U. S. 330, the Court found no breach of duty by the union in agreeing to an amendment of an existing collective bargaining contract, granting enhanced seniority to a particular group of employees and resulting in layoffs which otherwise would not have occurred. 'Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.' *Id.,* at 338. Just as a union must be free to sift out wholly frivolous grievances which would only clog the grievance process, so it must be free to take a position on the not so frivolous disputes. . . ."

The court then took up the question whether, even though the union was going to oppose them at the committee meeting, they were deprived of a fair hearing by having inadequate representation at the meeting. The court decided that a fair hearing was accorded because three stewards were transported there at union expense and were given an opportunity to state their position. The plaintiffs made no request to continue the hearing nor have they suggested what they could have added to the hearing by way of facts or theory if they had been differently represented.

In *Vaca v. Sipes* (1967), 386 U. S. 171, 87 Sup. Ct. 903, 17 L. Ed. 2d 842, the court held that not even proof that a grievance was meritorious is sufficient by itself to prove breach of the duty of fair representation but that arbitrary or bad-faith conduct on the part of the union must be shown.

We are also of the opinion that the above affidavits make out a prima facie case for summary judgment as

to the cause of action against the union and the company for conspiracy to deprive the plaintiff of his employment. The affidavits of Mr. Hammond and Mr. Uelmen indicate that Tully has no personal knowledge of any acts committed by the supposed conspirators, his only knowledge being hearsay, for example, what his fellow driver told him. He infers that the failure of the union representatives to vote for his position at the Wisconsin joint state committee, coupled with his opposition to the repeal of the Milwaukee Rider, indicates a conspiracy was afoot. This, we think, is wildest speculation on his part.

There remains the action for wrongful discharge on the part of the employer. A vexing question is whether a court can interpret the provisions of the contract alleged to have been violated or determine that the matter should have been resolved by the parties under a different provision of the contract than was actually used. If a court so decided, difficult questions as to the relative responsibilities of the union and the company for damages would then be presented. See *Vaca v. Sipes, supra,* at pages 195 to 198. In *Humphrey v. Moore, supra,* the Supreme Court of the United States, before it reached the fair representation issue, determined that the contract gave the union authority to act as it did. Does this mean that the court must make an independent interpretation of contract terms each time a grievance settlement comes before the court? An affirmative answer might mean that the union's settlement of a grievance can be challenged along with any company action found to violate the court-construed contract. One author has commented:

"If the court must look to the contract's terms each time to justify a grievance settlement, a more restrictive surveillance of union-employer grievance activity will result than exists where an arbitrator has the authority to act, despite the parties' intention, express or implied, that both actions shall be final and binding on all concerned. Arbitration is a contract creation and, not un-

naturally, the contract becomes 'the touchstone of the arbitrator's powers.' But, this is only of interest to the courts in determining whether the parties intended that a given grievance should go to arbitration. If they did, the court's function is at an end. By contrast, in *Humphrey v. Moore*, where the grievance was settled by the parties short of arbitration, we find a critical surveillance of the merits and the union's authority to act. Had the matter gone to arbitration with the same result, any such review by the courts of the arbitrator's decision on the merits and his authority to act would not have been tolerated." Van Zile, *The Componential Structure of Labor-Management Contractual Relationship: Republic Steel Corp. v. Maddox* and *Humphrey v. Moore*, 43 U. Det. L. J. (1966), 321, 334, 335.

In arbitration cases where the agreement is to submit all grievances to arbitration, the function of a court is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. *Steelworkers v. American Mfg. Co.* (1960), 363 U. S. 564, 567, 568, 80 Sup. Ct. 1343, 1363, 4 L. Ed. 2d 1403, 1432. Arbitration, however, is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. *Steelworkers v. Warrior & Gulf Co.* (1960), 363 U. S. 574, 80 Sup. Ct. 1347, 4 L. Ed. 2d 1409; *Atkinson v. Sinclair Refining Co.* (1962), 370 U. S. 238, 82 Sup. Ct. 1318, 8 L. Ed. 2d 462. The reason arbitration is so favored is that it is a system of self-government created by the parties to resolve disputes in which men acquainted with the peculiar problems of industrial relations can bring their expertise to the decision-making process. We do not think that it should be lightly assumed that *Humphrey v. Moore, supra,* considered the grievance procedure in so radically different a light that it was willing to subject the determination of the parties in a grievance procedure to court scrutiny every time they construe a collective-bargaining agreement. A close reading of the *Humphrey Case* indicates that the court was

construing the contract to determine whether the parties had agreed to use the grievance procedure to settle the kind of dispute that had arisen. The agreement stated that disputes arising when an employer "absorbs" the business of another shall be submitted to the grievance procedure. The court there construed a merger to be an absorption. In the case at bar, there is no question but that the present dispute is subject to the grievance procedure. See Article 8 of the agreement in footnote 1. Reasoning analogously from *Steelworkers v. American Mfg. Co., supra,* we conclude that the only review which can be had of the grievance procedure is on the question whether Tully was fairly represented and that he cannot seek review of the merits of a decision of a grievance committee unless he can show such bad faith or some other conduct undermining the integrity of the proceedings. Consequently, we think that the affidavits in support of the parties' motion for summary judgment make out a prima facie case as to the cause of action against Olson for wrongful discharge from employment.

The next procedure in summary judgments is to examine the affidavits in opposition to the motion to determine whether any controverted issue of fact remains for trial. Plaintiff submitted two affidavits in opposition to defendants' motion: That of Loren Tully and that of his wife, Carol Tully. Much of Loren Tully's affidavit recites the pleadings and indicates what issues of fact have been raised thereon. He argues that the contract supports his position taken at the grievance procedure. He also disputes the adequacy of the opposing affidavits. The affidavit does not controvert the facts that the union processed the grievance as far as it could and that it afforded Tully a hearing at the grievance procedure, nor does it show facts why a greater effort on the union's part should have been forthcoming. It does not expand on Tully's basis for believing a conspiracy existed between Olson and Local 200 beyond what has been shown in the affidavits of Messrs. Hammond and Uelmen. It

does present a slightly different version of a telephone conversation between Tully and Lane on the night of April 4, 1961; but what was there said is not a material issue of fact. The affidavit sets forth that on January 20, 1961, he was telephoned by Robert W. Gleason and asked to come to a meeting concerning the Milwaukee Rider, but we fail to see how this controverts a material fact or presents any evidence of a conspiracy.

The affidavit of his wife confirms Tully's version of the telephone calls with Lane and Gleason, states that Tully offered himself for work every night between April 5, 1961, and May 2, 1961, but that he was told he was off the list. It also states that she monitored a telephone conversation between Tully and the union steward wherein it was stated by the union steward that Roy Lane, president of Local 200, advised him not to come to the meeting. We are of the opinion that this affidavit does not raise any material issue of fact requiring a trial on the merits.

The affidavits in opposition to the motion for summary judgment not being sufficient to raise a material issue of fact after it has been determined that the affidavits in support of the motion have made out a prima facie case for summary judgment, and the decision of the joint state committee being final and binding, the judgment must be affirmed.

*By the Court.*—Judgment affirmed.