441 F.2d 1061
 77 L.R.R.M. (BNA) 2160, 65 Lab.Cas. P 11,697
 LOCAL 13, INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S
UNION, Appellants,
v.
PACIFIC MARITIME ASSOCIATION and International
Longshoremen's andWarehousemen's Union, Appellees.
 No. 22670.
 United States Court of Appeals, Ninth Circuit.
 April 21, 1971.
Rehearing Denied May 14, 1971.
 
 Kenneth W. Gale (argued), San Pedro, Cal., for appellants.
 Richard Ernst (argued), Dennis Daniels, San Francisco, Cal., Richard Patsey (argued), Norman Leonard of Gladstein, Andersen, Leonard & Sibbett, San Francisco, Cal., for appellees.
 Before BROWNING and CARTER, Circuit Judges, and* PENCE, District judge.
 BROWNING, Circuit Judge:
 
 
 1
 This is an action by a local union under section 301(a) of the Labor Management Relations Act, 29 U.S.C. 185, to set aside an arbitration award rendered under a collective bargaining agreement between the parent union and an employers' association. The district court entered summary judgment against the local. 278 F.Supp. 755 (C.D.Cal.1967). We reverse.
 
 
 2
 The Pacific Maritime Association is an organization of steamship, stevedoring, and terminal companies doing business on the pacific Coast. The International Longshoremen's and Warehousemen's Union is the exclusive bargaining representative of longshoremen in the area. Local 13 is the International's constituent local in the harbor areas of Los Angeles and Long Beach, California. This controversy centers around a member of Local 13, Pete Velasquez.
 
 
 3
 The Association and the International are parties to a collective bargaining agreement covering substantially all longshore work on the Pacific Coast.[1] Available work is distributed among longshoremen 'registered' in accordance with the agreement. Velasquez became a fully registered longshoreman in 1953. He served as an official of Local 13 on 'leave of absence' from his longshore employment from 1962 until October 1964, when he returned to active work as a longshoreman. In early December 1964, the employers' association initiated a grievance proceeding against Velasquez, complaining that he had repeatedly caused illegal work stoppages, both as an official of Local 13 and as a working longshoreman, and requesting his 'deregistration' pursuant to section 17.81 of the contract.[2]
 
 
 4
 The employers' complaint was processed through the contract grievance procedure, culminating in an arbitration award in June 1965 that 'deregistered' Velasquez, depriving him of the opportunity to obtain employment as a longshoreman on the Pacific Coast. Local 13 then commenced this action against the employers' association and the International union to set the award aside.[3]
 
 
 5
 The arbitrator's award was based primarily upon work stoppages that occurred while Velasquez was acting as an officer of Local 13. As will appear, Local 13's basic contention both in the grievance proceedings and in this litigation is that section 17.81 was not intended to apply to union officers and cannot be applied to them lawfully.
 
 
 6
 * Local 13 attacks the arbitrator's award on two theories. The first is that Local 13 is suing in its own right as a party to the grievance proceedings; in that capacity it challenges the award on the grounds specified in section 10 of the Federal Arbitration Act, 9 U.S.C. 10.[4]
 
 
 7
 The second theory is that Local 13 is suing as the representative of its member, Velasquez; in that capacity it attacks the award on the ground that the International union did not accord Velasquez his right to fair representation in the grievance proceedings as required by Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); and Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).
 
 
 8
 Although many of the considerations pressed by Local 13 may be relevant to either theory, the legal standards measuring whether a cause of action exists under the two theories are quite different. It is important to note at the outset, therefore, that the local may not challenge the award under the Federal Arbitration Act.
 
 
 9
 Assuming that the Arbitration Act is part of 'the substantive * * * federal law, which the courts must fashion from the policy of our national labor laws' to govern suits under section 301(a) of the Labor Management Relations Act,[5] Textile Workers Union, etc. v. Lincoln Mills, 353 U.S. 448, 456, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957), Local 13 may proceed under section 10 of the Arbitration Act only if it was a 'party to the arbitration.' 9 U.S.C. 10. See Acuff v. United Papermakers & Paperworkers, 404 F.2d 169, 171 n. 2 (5th Cir. 1968). Local 13 was not such a party.
 
 
 10
 The opening recitation of the collective bargaining agreement is that the contract is one 'by and between Pacific Maritime Association (hereinafter called 'the Association'), on behalf of its members * * * and the International Longshoremen's and Warehousemen's Union (hereinafter designated as 'the Union'), on behalf of itself and each and all of its longshore locals.' The contract also declares that 'the parties hereto are' the employers' association and the International union. Section 17, which details the grievance procedures, refers to the 'parties,' the 'Union,' and the 'Employer' (or 'Association'). Nowhere in section 17 are the locals mentioned.
 
 
 11
 The intention to vest control over grievance procedures in the International union on the one hand and the employers' association on the other seems as clear as language could make it short of explicit statement. Thus interpreted, the contract allocates power over grievance procedures in accordance with current notions of the arrangement most conducive to industrial peace. Local Union 12403, Dist. 50, U.M.W. v. Martin Marietta Corp., 328 F.2d 945, 947-949 (7th Cir. 1964); cf. Black-Clawson Co., etc. v. International Ass'n of Machinists, 313 F.2d 179, 183-184, 186 (2d Cir. 1962).
 
 
 12
 As Local 13 points out, its officers handled the presentation of the opposition to the employers' grievance during the first three steps of the grievance procedure, and the opinion of the arbitrator filed at the third stage named Local 13 as respondent.[6] However, there is nothing in the language of the contract to suggest a difference between the first three stages and the last two-- in all five steps the parent union, not the locals or the individual employees, is designated as the party on the union side. Accordingly, Local 13 must be regarded as having acted as the International's agent in the first stages of the proceeding. Moreover, the five-step procedure was a single, continuous, integrated process-- the decision reached at the first three stages was supplanted by the disposition of the same grievance at the fourth stage, and this in turn by the arbitration award that concluded the fifth stage.[7] Local 13 was not a party to the final two steps, either formally or in fact.
 
 
 13
 We conclude, therefore, that Local 13 was not a 'party' to the arbitration and may not challenge the award on the grounds available on direct review under the Federal Arbitration Act, assuming the latter statute applies to a section 301(a) suit or furnishes a "guiding analogy." Engineers Ass'n v. Sperry Gyroscope Co., 251 F.2d 133, 136 (2d Cir. 1957).
 
 
 14
 We turn to Local 13's attack upon the award in its capacity as the representative of Pete Velasquez.
 
 II
 
 15
 The substance of Velasquez's claim is that he was wrongly 'deregistered' under section 17.81 of the collective bargaining contract. An individual employee may bring suit for breach of such a contract in a federal district court under section 301(a) of the Labor Management Relations Act (Smith v. Evening News Ass'n, 371 U.S. 195, 200, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962)), and such a suit may be brought on the employee's behalf by his union. International Union, United Aerospace and Agr. Implement Workers, etc. v. Hoosier Cardinal Corp., 383 U.S. 696, 699-700, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966).
 
 
 16
 An employee's right to litigate the merits of a claim that a bargaining agreement has been breached to his injury is limited by the agreement's remedial provisions. 'Since the employee's claim is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced.' Vaca v. Sipes, 386 U.S. 171, 184, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967). See Republic Steel Corp. v. Maddox, 379 U.S. 650, 652, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). Accordingly, if the contract establishes an administrative remedy and makes it exclusive, the employee is bound by these provisions, with exceptions to be noted. The threshold inquiry, therefore, is whether the contract involved here provided an exclusive administrative remedy with respect to deregistration for illegal work stoppages that would bar suit by the deregistered employee.
 
 
 17
 As noted earlier the contract vested control of the grievance procedure in the International union rather than in the locals or in individual employees. Employer complaints of violation of the prohibition against illegal work stoppages were subject to these procedures. See particularly, sections 17.15, 17.52. The contract provided that these procedures were 'the exclusive remedy'; and 'no other remedies shall be utilized by any person with respect to any dispute involving this Agreement until the grievance procedure has been exhausted.' Section 17.15. Moreover, fifth-stage arbitration awards, like that involved here, were declared to be 'final and conclusive.' Section 17.27. The only reasonable conclusion from these provisions is that the administrative procedures detailed in the contract were intended to provide the exclusive remedy for claims of breach of the provisions regarding illegal work stoppages.
 
 
 18
 The local argues, however, that it was beyond the arbitrator's power to deregister Velasquez under section 17.81 because the work stoppages for which Velasquez was deregistered occurred while he was an officer of Local 13 and section 17.81 did not apply to union officials.
 
 
 19
 The opinion in Humphrey v. Moore, 375 U.S. 335, 345-348, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), does suggest that the right of an individual employee to litigate a breach of contract claim in a section 301(a) action will not be barred by an adverse ruling in an exclusive administrative procedure if the employee's contractual claim was not within the scope of that procedure.[8] To put the matter another way, the authority of the administrative decision makers to decide the issue-- their jurisdiction under the contract-- is open to challenge by the employee even though the contract purports to vest exclusive control over grievance procedures in his union.
 
 
 20
 Assuming Humphrey v. Moore establishes such a rule, it would not justify judicial review in this case of the merits of the arbitrator's determination that section 17.81 applied to union officials.
 
 
 21
 Section 17.81 is not a provision conferring authority upon the arbitrator to take action; as we have said, the arbitrator's authority arises from other provisions of the contract. Instead, section 17.81 is a prohibition of certain conduct by employees. An interpretation of this prohibition might be erroneous, but the error would not affect the arbitrator's power to make the decision. For example, it was also argued on behalf of Velasquez that his offenses were not 'deliberate' within the meaning of section 17.81. The arbitrator found that they were. Even if that determination was incorrect, it was clearly not beyond the arbitrator's power to make.
 
 
 22
 Moreover, if section 17.81 were a jurisdictional provision, the arbitrator's interpretation of that section still would not be subject to judicial review, in view of other provisions of this contract. Section 17.53 stipulated that 'the arbitrators shall have power to pass upon any and all objections to their jurisdiction.' The only recourse available if an arbitrator erred in assuming jurisdiction was found in section 17.54: 'In the event the parties agree that an arbitrator has exceeded his authority and jurisdiction, he shall be disqualified for any further service.' Since the parties bound themselves to accept even jurisdictional determinations of the arbitrator in any given case, the employee is similarly bound.
 
 
 23
 Finally, Local 13 relies upon the doctrine that although grievance procedures were exclusive and the arbitrator's award final, an employee may sue for breach of contract under section 301(a) if his union violated its duty to represent him fairly. Vaca v. Sipes, supra, 386 U.S. at 185-186, 87 S.Ct. 903; Humphrey v. Moore, supra, 375 U.S. at 342, 84 S.Ct. 363. 'Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.' 386 U.S. at 177, 87 S.Ct. at 910.
 
 
 24
 Keeping in mind that when materials lodged with the court permit 'a choice of inferences' 'the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion,' United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962),[9] we think a trier of fact might have inferred from the evidence that officials of the International union, motivated in part by hostility toward Velasquez, sacrificed his interests in order to gain a favorable result in another dispute with the employers' association. Without attempting a full summary of the facts permitting such an inference, we cite the following.
 
 
 25
 Shortly before the employers' association instituted proceedings against Velasquez, an officer of the International union (who was also a member of the Coast Committee) asked the president of Local 13 if Velasquez was 'still in your hair,' and assured him, 'Have no worry, son, we will take care of (Velasquez) up here.' Before the fifth stage of the grievance procedure commenced, the president of the International, which was to represent Velasquez, told Velasquez, 'You're through, you're all washed up.' During the presentation at this fifth stage, the International union, through its president, acquiesced in the position of the employers' association that section 17.81 applied to union officials as well as to working longshoremen. On the day the Coast Arbitrator issued the award deregistering Velasquez, he also issued an award in favor of the International union on a grievance concerning the individual packing of heavy sacks. Later the president of the International union told a witness, 'they had two arbitrations going and they had a deal working on the belly-packing-sacks matter and the Pete Velasquez case, and they had to sacrifice Pete Velasquez to gain the belly-packing-sacks matter. He then said that they had more at stake on the belly-packing-sacks matter than they had on the Pete Velasquez case which involved one man where the belly-packing-sacks issue involved many.'
 
 
 26
 We agree with appellees that a breach of the duty of fair representation would not be established merely by proof that the International union 'swapped' a concession that section 17.81 applied to union officials for acceptance by the employers' association of the position that the contract limited the individual packing of sacks. In this practical world such issues, susceptible of no absolutely 'right' solution, are often resolved by accommodation. Although such a choice might impose additional burdens upon union officials, including Velasquez, these burdens might be outweighed by benefits to working longshoremen. If the choice were motivated by a good-faith balancing of interests of different elements within the International union, it might well fall within the 'wide range of reasonableness * * * allowed a statutory bargaining representative in serving the unit it represents.' Ford Motor Co. v. Huffman, supra, 345 U.S. at 338, 73 S.Ct. at 686. 'Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance process.' Humphrey v. Moore, supra, 375 U.S. at 349-350, 84 S.Ct. at 372.
 
 
 27
 However, a union's freedom of choice between competing interests is 'subject always to good faith and honesty of purpose in the exercise of its discretion.' Ford Motor Co. v. Huffman, supra, 345 U.S. at 338, 73 S.Ct. at 686. It must appear that 'the union took its position honestly, in good faith and without hostility or arbitrary discrimination,' Humphrey v. Moore, supra, 375 U.S. at 350, 84 S.Ct. at 372, for the union must 'serve the interests of all members without hostility or discrimination toward any.' Vaca v. Sipes, supra, 386 U.S. at 177, 87 S.Ct. at 910.
 
 
 28
 Recognizing that the materials before the district court would support an inference that if a 'swap' occurred it was a good-faith choice between interpretations of two provisions of the contract, the evidence we have cited is also susceptible of a different inference, namely, that the International union, actuated in part by hostility toward Velasquez, elected to sacrifice him for a favorable outcome on the 'belly-packing' issue.[10] If a 'swap' occurred, and if the deregistration of Velasquez rather than an alternative interpretation of section 17.81 was the true consideration, Local 13 would be entitled to judgment.[11] If the duty of fair representation is to stand 'as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional powers of redress by the provisions of federal labor law,' id. at 182, 87 S.Ct. at 912 the deliberate sacrifice of a particular employee as consideration for other objectives must be a concession the union cannot make.[12] The issue was thus largely one of purpose.
 
 
 29
 Where motive and intent are central issues, a covert agreement is charged, and the principal alleged participants are aligned with the opposing party, as here, summary judgment is to be granted with great caution; for 'it is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised.' Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).
 
 
 30
 We think this is a case in which the witnesses should be heard.
 
 Reversed for further proceedings.[13]
 
 
 *
 Honorable Martin Pence, United States
 District Judge for the District of Hawaii, sitting by designation.
 
 
 [1]
 We are concerned with the agreement in effect during the period of June 16, 1961, to July 1, 1966
 
 
 [2]
 Section 17.81 of the agreement provided, in part, 'Any employee who is guilty of deliberate bad conduct in connection with his work as a longshoreman or through illegal stoppage of work shall cause the delay of any vessel shall be fined, suspended, or for deliberate repeated offense, cancelled from registration.'
 
 
 [3]
 Suit was filed in the Superior Court of the State of California of the County of Los Angeles but was removed by defendants to the United States District Court
 
 
 [4]
 Local 13 urges that the award was procured by fraud and undue means, that there was evident partiality and corruption on the part of the arbitrators, and that the arbitrators exceeded their powers by interpreting section 17.81 to apply to union officials as well as to working longshoremen
 Aside from these explicit statutory grounds, Local 13 challenges the award under section 10 on the ground that it is in 'manifest disregard' of the National Labor Relations Act (see Wilko v. Swan, 346 U.S. 427, 436, 74 S.Ct. 182, 98 L.Ed. 168 (1953)) in that it constitutes an unauthorized modification of section 17.81 of the contract to apply that provision to a union official, it assesses damages against a union official and is a discharge for union activities, and it provides the employers with a means to dominate, coerce, and interfere with Local 13 and to deprive Local 13's members of representation of their own choosing.
 Local 13 also argues that, as a party to the proceedings, it is entitled to have the award vacated as contrary to 'public policy.' See Local 453, Intern. Union of Elec. and Mach. Workers, A.F.L.-- C.I.O. v. Otis Elevator Co., 314 F.2d 25, 29 (2d Cir. 1963). Velasquez's deregistration contravenes public policy, in Local 13's view, because it violates the National Labor Relations Act in the respects just stated.
 
 
 [5]
 The Supreme Court has not clearly decided this question. See United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 577-578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); General Elec. Co. v. Local 205, U.E.W., 353 U.S. 547, 548, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957); Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 466-469, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (dissent of Frankfurter, J.); Dunau, Three Problems in Labor Arbitration, 55 Va.L.Rev. 427, 431 (1969)
 
 
 [6]
 The grievance procedure provided by the agreement included five steps, which the district court described as follows (278 F.Supp. at 759):
 '(1) a Joint Port Labor Relations Committee having jurisdiction over grievances and disputes that arise in a single port; (2) a Joint Area Labor Relations Committee having jurisdiction over a wider geographical area; (3) arbitration before an Area Arbitrator who has jurisdiction over the same area as the Joint Area Committee; (4) a Joint Coast Labor Relations Committee having jurisdiction over the entire geographical area covered by the collective bargaining agreement; and, finally, (5) arbitration before the Coast Arbitrator.'
 
 
 [7]
 Under the contract the decision of the Area Arbitrator at the third stage was 'final and conclusive except' when either party referred that decision to the Joint Coast Labor Relations Committee, and, if this Committee could not agree, to the Coast Arbitrator for review (17.25, 17.261). The decision of the Coast Arbitrator, however, was 'final and conclusive' without qualification 17.27)
 
 
 [8]
 Rothlein v. Armour & Co., 391 F.2d 574, 577-578 (3d Cir. 1968); Tully v. Fred Olson Motor Serv. Co., 37 Wis.2d 80, 154 N.W.2d 289, 294-295 (1967). Cf. Bieski v. Eastern Auto. Forwarding Co., 396 F.2d 32, 37, 41 (3d Cir. 1968)
 
 
 [9]
 See also Adickes v. S. H. Kress & Co., 398 U.S. 144, 157-158, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)
 
 
 [10]
 The Association and the International insist that interpreting section 17.81 to apply to union officials was reasonable; Local 13 contends that it was both contrary to national labor policy and 'flagrantly against union principles.' While it would appear that appellees' construction of the somewhat ambiguous language of section 17.81 was not in itself so unreasonable as to lend support to an inference of bad faith, we do not preclude Local 13 from attempting to make such a showing at trial. If the International agreed to an interpretation patently lacking in merit, this is itself might be evidence that its representation was unfair-- to that extent the merits of the issue of contract interpretation are open to judicial examination. See Lewis, Fair Representation in Grievance Administration, 1967 Sup.Ct.Rev. 81, 108; Comment, Union's Duty to Fairly Represent its Members in Contract Grievance Procedures, 19 Syracuse L.Rev. 66, 85 (1967); cf. Levy, The Collective Bargaining Agreement as a Limitation on Union Control of Employee Grievances, 118 U.Pa.L.Rev. 1036, 1057-58 (1970)
 
 
 [11]
 Of course, as Vaca v. Sipes, supra, makes clear, a union may decide not to initiate a grievance at a member's request, and also may choose not to pursue a member's grievance to the end of the procedure, if its decision is made in good faith, based upon an evaluation of the merits of the employee's claim and of the most advantageous expenditure of the union's energies and resources. See, e.g., Acuff v. United Papermakers & Paperworkers, supra, 404 F.2d at 171. What we hold is that a union may not agree with an employer, either expressly or tacitly, to exchange a meritorious grievance of an individual employee for some other supposed benefit
 
 
 [12]
 The adequacy of the protection afforded individual employees by the 'fair representation' standard has been questioned, particularly when such critical interests as the employee's job are at stake. H. Wellington, Labor and the Legal Process 162 (1968); Levy, The Collective Bargaining Agreement as a Limitation on Union Control of Employee Grievances, 118 U.Pa.L.Rev. 1036, 1055 (1970); Lewis, Fair Representation in Grievance Administration, 1967 Sup.Ct.Rev. 81, 106; Comment, The Implications of Vaca v. Sipes on Employee Grievance Processing, 17, buffalo L.Rev. 165, 172, 181 (1967); Note, Section 301(a) and the Employee: An Illusory Remedy, 35 Fordham L.Rev. 517 (1967); Note, The Duty of Fair Representation and its Applicability When a Union Refuses to Process an Individual's Grievance, 20 So.Car L.Rev. 253, 260, 268-69 (1968); Comment, Union's Duty to Fairly Represent its Members in Contract Grievance Procedures, 19 Syracuse L.Rev. 66, 84-85 (1967); Comment, Protection of Individual Rights in Collective Bargaining, 14 Vill.L.Rev. 484, 496 (1969); Comment, The Duty of Fair Representation in the Administration of Grievance Procedures under Collective Bargaining Agreements, 1968 Wash.U.L.Q. 437, 445 (1968); Comment, Individual Control over Personal Grievances, 77 Yale L.J. 559 (1968); Comment, Federal Protection of Individual Rights under Labor Contracts, 73 Yale L.J. 1215, 1239, 1241 (1964). But see C. Updegraff, Arbitration and Labor Relations 132 (3d ed. 1970)
 In Rothlein v. Armour & Co., 391 F.2d 574, 580 (3d Cir. 1968), the court indicated that in some circumstances 'an infirmity less than' a breach of the duty of fair representation might require court examination of the merits of an issue decided in grievance proceedings. See also Bieski v. Eastern Auto. Forwarding Co., supra. Because we conclude that summary judgment was improper on the legal theory that the International union breached its duty of fair representation, we do not consider whether a lesser 'infirmity' might permit an employee to pursue his claim in court after an adverse decision by an arbitrator. Summary judgment is improper if the opposing party would be entitled to prevail under any reasonable construction of the evidence and any acceptable theory of law. Industrial Bldg. Materials, Inc. v. Interchemical Corp., 437 F.2d 1336, 1340 (9th Cir. 1970).
 
 
 [13]
 The district court entered judgment 'confirming and enforcing' the arbitration award as well as dismissing Local 13's complaint. 278 F.Supp. at 773. There was no controversy between the parties to the grievance proceedings-- the Association and the International-- over the arbitration award. The court therefore limited its review to Local 13's 'collateral attack' upon the award. Id. Although we do not reach the question because of our disposition of the appeal, we doubt that it is appropriate for a court to enter judgment confirming an award in a suit in which the only controverted issues concern an unsuccessful attempt by a third party to attack the award collaterally